## NATIONAL LABOR RELATIONS BOARD *v.* BRADFORD DYEING ASSOCIATION (U. S. A.) ET AL.

No. 588.   Argued March 26, 27, 1940.—Decided May 20, 1940.

Mr. *Charles Fahy*, with whom *Solicitor General Biddle* and *Messrs. Robert B. Watts, Laurence A. Knapp,* and *Mortimer B. Wolf* were on the brief, for petitioner.

Mr. *Harry Parsons Cross*, with whom *Mr. George Paul Slade* was on the brief, for Bradford Dyeing Association, respondent. Mr. *William G. Feely* submitted for the B. D. A. Employees Federation, respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The Circuit Court of Appeals declined to decree effective enforcement of an order of the National Labor Relations Board upon the ground that the Board's order, in material respects, rested upon findings that were not supported by substantial evidence.

In its petition for certiorari, the Board took sharp issue with the Court of Appeals, asserting that some findings upset by the court were supported not merely by substantial but by "uncontradicted" and "undisputed evidence." The petition also pointed out that the court's opinion was "ambiguous and inconclusive" and "left unclear the court's holding as to whether the Board had jurisdiction." Our inspection of the court's opinion and decree disclosed that the court deemed the Board to be wholly lacking in jurisdiction. Nevertheless, the Board was ordered to proceed in accordance with the opinion which concluded with the indecisive statement that "if the case should not be dismissed for lack of jurisdiction" a large part, but apparently not all, of the Board's order should be vacated. The court's decree did not direct enforcement even of those parts of the Board's order not expressly vacated. The Board's petition further pointed out that its motion for rehearing in order to clarify the question of its jurisdiction and to establish the status of "those portions of the Board's order which the court neither vacated nor enforced" was denied without explanation. Because the Labor Board's petition in challenging the action of the Court of Appeals thus raised questions of grave public importance affecting the administration of the National Labor Relations Act and judicial review as provided in the Act, we granted certiorari.[1]

This proceeding was initiated upon charges filed by the Textile Workers Organizing Committee of the C.I.O. Thereupon, the Labor Board served a complaint and notice of hearing on the Bradford Dyeing Association (U. S. A.), respondent here.

In the complaint, it was alleged that respondent in order to discourage membership in the C. I. O., had discharged and refused to reinstate its employees, Edward

[1] 308 U. S. 549; cf. *Labor Board* v. *Waterman Steamship Co.,* 309 U. S. 206.

Nelson and Percy Schofield, because of their affiliation and activities in the Textile Workers Organizing Committee of the C. I. O., (T. W. O. C.); respondent had dominated and supported the Bradford Dyeing Association Employees' Federation, a labor organization, and had refused to bargain collectively with its employees through the T. W. O. C. after a majority had selected it as their bargaining representative.

The Board's jurisdiction was unsuccessfully challenged on the ground that respondent's business involved no activities in or affecting interstate commerce within the meaning of the Act. And, answering, respondent alleged that Schofield was discharged because he smoked during working hours; "that . . . Nelson was not discharged, that he was insubordinate and defiant, that he did not work and refused to work during the times when he was supposed to be working, that he was on the premises during hours when he was not supposed to be on the premises of respondent and was taking up the time of other employees who were supposed to be working during such time, that . . . Nelson went upon a vacation and has not returned to work after such vacation nor made any statement of his readiness to return to work or made any request that he be put to work again"; that respondent had not dominated or coerced the Federation; and that any labor disputes at its plant were attributable to the conduct of the T. W. O. C.

The Federation was allowed to intervene in the extensive hearing held by the Board.

After this hearing, the Board found that "a labor dispute" in respondent's plant would widely affect "the flow of commodities in interstate commerce," with consequent jurisdiction in the Board, and that the charges of the complaint had been substantiated.

The Board accordingly ordered respondent to cease and desist from (1), interfering, or coercing its employees

in the exercise of their rights to self-organization; (2), dominating and interfering with the Federation or any other labor organization; (3) discouraging membership in the T. W. O. C.; (4), refusing to bargain collectively with the T. W. O. C; and (5), ordered respondent affirmatively to offer reëmployment to Schofield and Nelson and to make them whole, to withdraw all recognition from and completely disestablish the Federation, to bargain collectively with its employees through T. W. O. C., and to post the usual notices throughout its plant stating that the company would cease its unlawful and unfair labor practices and would treat its agreement with the Federation as of no effect.

In its final decree the Circuit Court of Appeals directed that "until a new election has taken place by order of the Board, and the employees have expressed their preference as to what group or body shall represent them in any labor disputes between them and the respondent, the order of the Board, except as to paragraphs (1), (2), and (3) of the cease and desist portion of the order, and the entire paragraph ordering affirmative action, shall be vacated; the Board then to proceed in accordance with the opinion passed down this day." As phrased, the decree is not clear but apparently the court vacated subdivisions (4) and (5) of the Board's order. The court's opinion did make clear that under its decree the company was left free to bargain collectively with the Federation and to decline to bargain with the T. W. O. C. Discharges of Schofield and Nelson were approved and the company was released from publishing notices which, if warranted, were "essential if the employees were to feel free to exercise their rights without incurring the company's disfavor." [2] Although those portions of the Board's order prohibiting the company's interfering with

---

[2] *Labor Board* v. *Falk Corp.*, 308 U. S. 453, 462.

its employees' union affiliations were not expressly set aside or modified, neither were they ordered enforced.[3] Thus the court's decree gave the Board's order no effect at all.

It did not explicitly so decree, but the Court of Appeals evidently was of the view that evidence was lacking upon which the Board could have found that respondent's business was in or affected interstate commerce. The court expressly found a lack of evidence to support the Board's conclusion that Schofield and Nelson were discharged for union activities and stated its belief that Schofield was discharged for smoking in the plant and Nelson for insubordination, and that "the finding by the Board that the T. W. O. C. had a majority of the employees of the respondent signed up even to become members of a union under that name is without substantial evidence on which to rest."

Without specifically passing upon the Board's finding that respondent had unlawfully dominated the Federation, the opinion of the court stated, ". . . *assuming that the president or officers of the respondent influenced its employees to join the Federation, so-called,* it does not appear by clear and substantial evidence that a majority of the employees ever joined, or indicated an intent to join, the T. W. O. C., . . ." [Italics supplied.] Since the court

---

[3] Section 10 (e) of the National Labor Relations Act gives the Board power to petition any Circuit Court of Appeals of the United States for the enforcement of its order; grants these courts exclusive jurisdiction and provides that "Upon . . . [the Board's filing a transcript of the entire record in the proceeding], the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to . . . make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." 49 Stat. 449, 454.

did not vacate that part of the Board's order directing the company to discontinue domination of the Federation, we might infer that the court accepted the Board's finding that the Federation had been so dominated. But this inference is opposed by the court's action in vacating the order of disestablishment. The uncertainty in which the court has left the questions of jurisdiction and company domination of the Federation makes necessary a review of the evidence on both, along with other evidence which we think amply demonstrates the justification for the Board's order in every respect.

*First. As to Jurisdiction.*

A major portion of the opinion of the court below is devoted to its expression of doubts about the Board's jurisdiction, i. e., "there is no substantial evidence to warrant a finding that the transportation of these materials by the respondent was ever in interstate commerce"; "there is also lacking substantial evidence that forty per cent of the supplies consisting of chemical and dyes, which were contracted for in Rhode Island and delivered by the sellers to the respondent's plant in Bradford, were transported by the respondent in interstate commerce, or that they were used by the respondent except at Bradford, though the Board assumed without evidence that they were shipped by the respondent in interstate commerce, but its assumption lacks substantial evidence on which to rest, that would compel this court to accept it as a fact"; "The respondent, according to uncontroverted testimony, neither sells, transports, nor arranges for transportation of the goods into or out of Rhode Island in interstate commerce which is done in each instance by the customer, . . ."; and "The Board apparently assumed that the respondent transported goods to its plant and from it, which the uncontroverted evidence disclosed were not the facts." Referring to waste products which respondent sells in interstate commerce, the court noted that they did

not "exceed one per cent of the total goods processed" and said that they were but "a mere incident . . . [of the business] to which the maxim *de minimis* might well be applied, even by the National Labor Relations Board." And the conclusions of the opinion were only stated subject to the condition "If the case should not be dismissed for lack of jurisdiction."

There was evidence before the Board which showed:

The Bradford Dyeing Association (U. S. A.), as stated by its president, is "engaged in the dyeing and finishing of cotton, rayon and acetate piece goods." These piece goods reach the plant at Bradford, Town of Westerly, Rhode Island, as unfinished "gray goods." Customers of Bradford, known as "converters," ship the gray goods to the plant, retaining title, and direct shipment of the goods when processed. Bradford owns no goods or means of transportation, and its customers pay the cost of transportation to and from the plant. A New York office is maintained, however, "where . . . solicitors [who contact converters] make their headquarters," and advertisements are run in New York papers and trade journals. A majority of Bradford's (converters) are located in States other than Rhode Island, in Baltimore, Boston, Philadelphia, Trenton, and principally in New York City. There are "very few customers" in Rhode Island. In 1936, 57,000,000 yards of goods were processed and for the first six months of 1937, 29,000,000. About ninety per cent of all goods processed, the processing taking "an average of between two and three weeks," are shipped out of Rhode Island. "More than half" of the goods processed come from beyond the borders of Rhode Island.

Incidental to its business of processing, respondent accumulates and acquires title to "remnants" which are ends of cloth processed and goods damaged in processing. In 1936, 588,000 yards of remnants were sold by respondent, ninety per cent of which was shipped in interstate commerce. These remnants represented roughly "just less than one per cent" of the yards processed in that year. For the same year, respondent purchased $355,856.00 worth of colors and dyestuffs, weighing over 235,111 pounds, of which forty per cent came from outside of

Rhode Island. The company, during 1935, averaged 688 employees, with wages of $604,614.68, and its gross income from processing was $2,026,156.00. In 1937, the employees on the payroll were nearly 800.

That this evidence was abundantly sufficient to justify exercise of jurisdiction by the Board is not now open to controversy. It is settled that the Act is applicable to a processor, who constitutes even a relatively small percentage of his industry's capacity,[4] where the materials processed are moved to and from the processor by their owners through the channels of interstate commerce,[5] and it is not material, as the court below thought, that respondent's customers might be able to secure the same services from other Rhode Island processors if a labor dispute should stop the interstate flow of materials to and from respondent's plant. Since the purpose of the Act is to protect and foster interstate commerce, the Board's jurisdiction can attach, as here, before actual industrial strife materializes to obstruct that commerce.[6]

*Second. Discharge of Nelson.*

In its answer to the Board's complaint, the company contended that Nelson was not discharged April 3, 1937, but was merely "laid off," and on April 2, "went upon a vacation" and did not return or indicate a willingness to go back to work. However, the company insists, as it has throughout, that Nelson was not a diligent worker and was insubordinate; that he trespassed upon company property after work hours Thursday, April 1st; that "one or two mornings that week he started work a little late

---

[4] The record indicates that respondent does roughly one per cent of the national total of business in its industry.

[5] *Labor Board* v. *Fainblatt*, 306 U. S. 601.

[6] *Consolidated Edison Co.* v. *Labor Board*, 305 U. S. 197, 222; cf., *Labor Board* v. *Jones & Laughlin Corp.*, 301 U. S. 1, 43. A strike at respondent's plant in 1929 apparently did result in a stoppage of the flow of the interstate movement of materials to and of processed goods from respondent's plant.

and quit a little early"; that he did not start work Saturday, April 3, until 7:30, a half hour late.

Some of the evidence supporting the Board's finding that Nelson was actually discharged for union activities on April 3, was:

Prior to Saturday, April 3, 1937, when Nelson was "laid off," he had worked for the company two years as a carpenter. He had become actively interested in organizing the employees in a C. I. O. union the preceding Monday, March 29, 1937. On that day, he had obtained three hundred and fifty T. W. O. C. cards from a. fellow employee (Schofield), who, he heard, "had some applications for joining the union, the C. I. O." His distribution of the cards met with quick response and many signed so that on Friday, the company official "who does all the hiring," approached him and said, "You're a ringleader of the C. I. O., but you are not going to be fired for it." Nelson refused to tell this official the names of his collaborators in forming the union and also told him he would not reveal their names to Mr. Summersby, the company's president and general manager. Later that day, Nelson observed Schofield talking with Summersby and was introduced to the latter as "helping . . . [Schofield] to organize and get these pledge cards signed in the mill." He was, that same day, Friday, refused admission to a meeting in Summersby's office between some employees and Summersby, but that afternoon, after work, he was called to Summersby's office. There Summersby asked "why didn't we form a local union of our own" and "thought it was a much better plan to form a local union." And Summersby asked that the question of a local union be put up to a C. I. O. committee meeting to be held that night.

All day Friday and Saturday morning, his foreman "didn't speak one word to" Nelson. Saturday morning, April 3, this foreman asked him "when [he] . . . intended to start work" but added that he "didn't hold anything against" him. When Saturday's work was over, Nelson was sent for by Summersby, who was affable at first, but who became hostile when Nelson indicated he would not go along with a local union. Sum-

mersby then asked Nelson if he had been stealing on an occasion when he had returned to the plant after hours to get some T. W. O. C. cards, and asked him if he had begun work promptly that day (Saturday, April 3). Nelson was told by Summersby "to take two weeks off and cool off." Nelson insisted he was ready to go back to work Monday morning. His testimony narrated this conversation in part as follows

"A. . . . I said, 'As far as being excited about it, you are more excited than I am and you are worried about it and I ain't.' He says, 'Sure, I am excited about it, but you are the cause of all it.' I said, 'I can't help that.' He said, 'You take the two weeks off and then come back and see Mr. Pierce.' I said, 'Meaning what, that I go back and see Mr. Pierce? I am not sure of a job when I come back? Or is this just a matter of beating about the bush to fire me?' He says, 'I won't give you nothing definite.' I says, 'I want something definite. I want to know whether or not you are firing me. If you are not telling me whether I go to work when I come back or not, I want to know whether you are firing me.' He says, 'I won't give you nothing definite.' I says, 'I can't go out without money. If you are going to fire me, I can't live without money.' He says, 'Silvia, get his money.' Mr. Silvia went out and got me my money and came in and I thanked Mr. Silvia for my money and went out. When I was halfway across the outer office I heard laughing, and I saw Silvia swing his arm down, and Mr. Silvia and Mr. Summersby were laughing for all they were worth, as though they had pulled a big joke."

"Q. Did you ever go back after that for your job? A. No I didn't. Mr. Summersby told me if I stepped foot on the premises within two weeks he was going to have me arrested."

Nelson never went back because a T. W. O. C. official who conferred with Summersby said Summersby would not take him back. This T. W. O. C. official and a Conciliator of the United States Department of Labor said Summersby wouldn't take Nelson back because "there would be a question of his authority." In fact, a fellow employee told Nelson that Summersby had said some-

thing about firing Nelson and Schofield and "that he would find some way of getting around it." On the morning of the day Nelson was fired he had spent a "couple of minutes" telling other employees about a C. I. O. meeting of the previous night.

From the testimony of the T. W. O. C. official in question, a T. W. O. C. Director for Rhode Island, Summersby would not rehire "especially Mr. Nelson." And Summersby himself stated that he told the Federal Conciliator, "I couldn't take back either of them because it would break down the discipline of our plant."

Nelson's foreman testified as a witness for respondent—

On Friday, April 2, "I could see that he [Nelson] was talking around more or less, and so I had him come in the shop to work on the trucks. I thought that would be the place where I could watch him better." He saw Nelson talking to the men early on April 3, before work and until 7:30, although work begins at 7. He reported to his superior that Nelson was "talking to different ones," and went with Nelson to Summersby who asked Nelson "if he decided, on some question that they were talking about the afternoon before . . . [Nelson] said, 'No,'" and Summersby said, "Well, then, if you can't give me a satisfactory answer on that I have thought it over and I have decided to lay you off for two weeks and let you think it over." This foreman "knew . . . [Nelson] was interested in the C. I. O., but . . . didn't know anything he said" to the men Saturday morning. On other occasions, he had seen Nelson start late or quit early without ever reporting the fact, and had seen Nelson talk around like that "quite often" but "this is the only time . . . [the foreman] ever got mad at him." This time, he was aware that Nelson had been connected with the C. I. O. for the past week "and . . . supposed he was still at it." The foreman admitted that Nelson was "a very good workman," that he may have worked between 7 and 7:10 on this particular Saturday morning and that on Saturday, April 3, Nelson, after having been spoken to, "said he hadn't any feelings but what he would go on and do his work all right. And he did after that."

According to the Chief Engineer, who ranked above Nelson's foreman—

Nelson previously "did a whole lot of talking." In his three years with the company, he had seen others talking but never laid any one else off for talking. In his view "when men are talking with one another there is very little work done," but the foreman did not report the men to whom Nelson was talking on April 3, although they also were "surely" wasting time. The plant rules do not forbid talking.

Summersby, the president and general manager—

On April 2, "inquired as to who [Nelson] . . . was and what he did and if he had been active in the C. I. O. as an organizer." Nelson, he stated, "automatically forfeited his job" by not coming back at the end of his two weeks lay off, which was without pay. And if he should apply for work, his forced vacation "would be on his record and would always be a black mark against him."

*Third. Discharge of Schofield.*

The court below saw no evidence supporting the Board's findings that this employee was discharged for union activities, and accepted the company's contention that he was discharged for smoking in the plant contrary to rules. Respondent admits that Schofield was discharged.

Schofield, a machine operator, or "jigger," testified—

On Saturday, March 27, 1937, he attended a C. I. O. meeting, obtained eight application cards for the C. I. O. and talked to some of his fellow employees about the C. I. O. All eight cards were signed that night. By Sunday, March 28, he had asked for and obtained seven hundred cards which he used during the following week, giving Nelson about one-half on Monday, March 29. By Wednesday, the cards gave out. On Friday, April 2, he and Summersby discussed certain difficulties with the piece work of "jiggers." Summersby, talking there in the plant, brought up the C. I. O. and said "he couldn't see anything in an organization outside . . . [with] . . .

big shots . . . running big automobiles and hotel expenses."

Summersby then suggested "a union of our own in the shop." Schofield attended a meeting in Summersby's office as a member of a committee of "jiggers," and the subject of the C. I. O. arose again. Summersby said he wouldn't recognize an outside union. When Nelson attempted to enter this meeting, Summersby turned him away and referred to him as a "troublemaker." Sunday, April 4, there was a C. I. O. meeting at which Schofield and Nelson were both on the platform. Schofield went to work on Monday, the 5th, continuing to distribute C. I. O. cards. On Tuesday, the 6th, at 2:25 (Nelson had been "laid off" on the 3rd), a "charge hand" notified Schofield that Summersby wanted to see him "in his office right away." He left his work and went directly to the locker room to wash and change from work clothes. While there, he and two other employees were smoking. An official of the company—a boss dyer—whom he had never seen "in the locker room, not while the men were changing their clothes"—caught Schofield smoking and said, "So that's it, you damn fool." Schofield then went to Summersby's office as he had been directed, but did not find him there. Summersby's first words, on entering the office about twenty minutes later, charged Schofield with smoking, but Summersby refused to tell Schofield why he had originally been sent for—before he was caught smoking. Schofield was told to "take a couple of weeks off." He had been laid off once before for smoking.

On the Friday before the Tuesday on which this employee would, he thought, have been taken back to work, a Federal Conciliator and C. I. O. officials conferred with Summersby about Nelson and him. The C. I. O. official told Schofield that Summersby refused to rehire either, and as a result he never went back. Although he "wanted to go back the first week," he took the word of the Federal Conciliator and the C. I. O. official that he would not be rehired. The two other employees who were smoking when he was caught were not disciplined, although the accosting official could see them. Despite "No Smoking" signs, it was the practice of the men to smoke on the sly. Other men have been laid off two

weeks for smoking, but Nelson was caught and "others" have been seen by foremen and no lay-offs resulted. Schofield didn't "know of any one being discharged" for smoking. He was made T. W. O. C. local financial secretary.

In the words of the C. I. O. official, "Mr. Summersby saw red the minute I mentioned Schofield's and Nelson's names."

As told by the boss dyer who found Schofield smoking—

This official had sent an employee to notify Schofield of Summersby's desire to see him; he himself went to the locker room to deliver the message. He asked one of the other employees in the locker room to remember the scene because he "knew Percy Schofield's character." It was his duty to detect smokers and he usually laid off, himself, any man found smoking. He had time to lay off Schofield while walking with him part of the way to Summersby's office, but he did not do so. "It was a peculiar case and I wanted to think before I did anything." This was the only case in which he had ever reported a smoker to a higher up. He had laid Schofield off for two weeks twice before, for smoking. In six or seven years, he had caught seven or eight smokers of whom, excepting Schofield, only one was discharged. He didn't go to the wash room "very often." "A very short time before" he had heard that Schofield was somewhat active in the C. I. O.

One of the fellow employees present in the locker-room where Schofield was found smoking, stated that he also had been smoking but was not doing so when the boss dyer came in, and that the third man was smoking at that time but wasn't observed. He got the impression, then, that the boss dyer said something to the effect that he at last "had" Schofield after having been after him for some time. He "had never seen . . . [the boss dyer] go to the locker room" before.

Summersby testified that he had been told by Schofield that he was "interested in organizing the C. I. O."; and that he discharged Schofield for smoking.

*Fourth. Domination of the Federation.*

As already noted, the Court of Appeals' opinion did not especially pass upon this contention. Since, however, the Court did not enforce the Board's order to cease dominating and to disestablish the Federation, as we think it should have, appropriate evidence on this issue will be pointed out.

A machinist, employed eleven years by respondent, testified—

He attended a meeting in Summersby's office on April 6, the day of Schofield's discharge. Summersby "said that he wouldn't recognize the C. I. O. and that it would be much better for us to join our own union than to be bothered by this C. I. O." which would require the men to go out on sympathy strikes. This employee saw Federation cards and literature "on the table" in the company's office. These were "handed around" and one or two were picked up by the employees present; when Summersby and the vice president of the company left the room, the employees "seemed to pick them up more frequently." Temporary officers of the Federation were chosen there, in Summersby's office. A day or so later, the Federation met in the company's shipping room with one hundred and fifty to two hundred men present; Summersby addressed the meeting and said he would not recognize the C. I. O. and that it was better to have our own union. The machinist distributed in the plant the Federation cards which he had "picked . . . up" in "Summersby's office"; the Federation cards "were there."

From testimony of other employees, it appeared that—

At the meeting on the 6th (the day Schofield was discharged) in Summersby's office, Federation cards and circulars were seen, and an employee distributed these

cards; Summersby said "he would like to have this local union" and "wouldn't recognize the C. I. O." Three "jiggers" had seen Summersby on April 5 about wages and conditions of employment; he "thought it would be better if we had our own union" instead of paying outside fellows. "Someone" suggested that cards be passed out for a local union. Word was passed out by fellow workers that the company would pay for time spent at the meeting in the shipping room, at which Summersby "said he wouldn't recognize C. I. O. or A. F. of L., no outside union," that it would "be better if we had a local union" instead of paying others to ride around in big cars and that "he would not tolerate C. I. O." Workers were seen passing out Federation cards in the plant during working hours. Pay was given for the half-hour spent in the shipping room meeting and this time was included by instruction of the "boss of the frames." Federation cards were passed out "openly" by men on the day of the shipping room meeting. Bosses were seen with cards. One employee was given his Federation card by the boss of his department. Another was asked by his foreman whether he had joined the Federation.

An employee testified—

Summersby sent for him on April 6, (the day of Schofield's discharge). The paymaster came to his house for him and said he was glad that this man wasn't "deep . . . in the C. I. O.," and took him to the office. There Summersby told him he was sorry that men in his line of work (in the gray room) had been left out of the meeting that morning in Summersby's office. This employee had told the men in the gray room that they shouldn't sign cards from a meeting at which they had not been represented. Summersby told him the C. I. O. would take money out of the plant and that a "committee had gotten together . . . to form this local union, because he informed them that he wouldn't recognize the C. I. O., and they started to organize a union that he would recognize. He said he would recognize the local." He and Summersby then went into the meeting in an adjoining office ("one is Mr. Pawson's [respondent's vice president] and the other is Mr. Summersby's").

A leader at this meeting in company offices and attended by Summersby, "said a few of them got together and decided they didn't want a C. I. O., that they thought they would be better off if they had a local union, that they had a talk with Mr. Summersby, and Mr. Summersby wouldn't recognize the C. I. O., and rather than have trouble he was going to see if we couldn't have a local union." Summersby "explained advantages of the local union and spoke of the B. D. A."

Another employee supplied evidence that a week or two after Nelson was fired, the timekeeper took him to see Summersby, who asked about a C. I. O. card which had been on the back of this employee's car, and that Summersby then "said he wouldn't recognize it" and could close the plant down.

The financial Secretary of the Federation stated—

He was first given a temporary appointment at the meeting in Summersby's office, April 6, when Summersby said "he didn't like the idea of bargaining outside." The men present in the afternoon meeting in Summersby's office "asked for the privilege of using the office to find out how we had made out on our cards." The meeting in the shipping room was a day or so later. After the morning meeting in Summersby's office on the 6th, this temporary Federation official started passing out Federation cards for which Summersby had given permission. Federation circulars were posted on plant bulletin boards. Federation application cards were passed out by "all of us that were in the office at that first meeting." Officers of the Federation were subsequently elected (April 11). "All us men who were in the office the first day, I think we acted as a committee." Between April 6 and 11, Summersby permitted the temporary committee to meet in an old company office in the plant. The paymaster gave them a list of the men in the plant by which to determine the necessary fifty-one per cent. On April 9, prior to the election of the Federation's officers on the 11th, this temporary committee presented a letter to Summersby stating that they represented fifty-one per cent of the men. That same day, Summersby granted

recognition to the Federation. This employee felt no need for organization, except for "better feeling" which he thought "was necessary because the C. I. O. was going to do the same thing." He helped form the Federation "partly" to stop the C. I. O., and because the C. I. O. had already started. A company car was used by him on one occasion for purposes of the Federation. Meetings of the executive committee of the Federation were held in a club room "on property owned by the B. D. A." This witness engaged as attorney for the Federation one who he knew "had represented . . . [the company] on some cases"; he himself lives in a house owned by the company. Some Federation dues were collected on the company's premises; members were not suspended for dues delinquency and may also be members of any labor union or society. The Federation started about a week after the C. I. O. drive; it had no income of its own prior to the last week in April. Eventually it affiliated with an outside union still designated "as the B. D. A. Employees' Federation" "to bring a little more prestige and to prove to the ones that were skeptical, that we were not a company union."

The first vice president of the Federation testified—

He negotiated recognition of the Federation, April 9, (three and six days respectively after discharge of Schofield and Nelson) as its acting president. On that day, he called a meeting of the organizing committee in "the little office in the gray room," showed them that they had fifty-one per cent signed cards, and then went to Summersby's office. In Summersby's office, the witness and company officials counted the signed cards and checked them against a list of employees which Summersby asked the paymaster to get. The cards were not checked to see if each signer was eligible; the management took the temporary committee's word for it. And the cards were left with Summersby. The witness didn't know that the Federation planned to do anything that "was any different" from what the employees previously could have done by grievance committees. He had heard rumors that a boss had Federation cards or spoke to employees about them, and believed one man quit work as the result of posting C. I. O. hand-bills.

He spoke at the shipping room meeting and asked Summersby to speak there. Summersby did speak. Along the lines of his conversation at the two previous meetings in his office, Summersby told this gathering of employees that he preferred a local and "was not in favor of bargaining with the C. I. O."

T. W. O. C.'s State Director for Rhode Island stated—

On April 7, he saw Summersby and told him T. W. O. C. had "about seventy-five per cent" of the men signed. Summersby refused to say then that he would recognize T. W. O. C. April 16, the Director, a Federal Conciliator and a T. W. O. C. organizer saw Summersby again and were told by Summersby that "he had a union" and wouldn't recognize the C. I. O. as he was "afraid of an outside union." It was agreed that he would hear from Summersby's attorney after the first (April 7) meeting, but he never heard. A form contract was submitted to Summersby on the 16th, but by that date "he had definitely decided that he would refuse to bargain with the C. I. O."

According to the company's vice president—

He was present part of the time at one of the meetings in Summersby's office on April 6, where cards and literature were present and a union was discussed. Summersby was heard to express the opinion "that he would prefer to deal with a union of his own employees rather than to deal with outside influences."

One of the men present when Schofield was found smoking testified that a salaried employee who reports "things which are done wrong" came around and asked everybody if he had joined the local union; at the meeting in the shipping room, Summersby said he would not recognize the C. I. O. but would recognize a local; the witness was paid for the fifteen minutes spent at that meeting; the men were told by the time-keeper that they would be so paid. An official of the Federation said, "The impression was that Mr. Summersby probably wouldn't recognize" the C. I. O.; this official was "one

338

of the first" organizers of the Federation and conveyed to people the impression that Summersby wouldn't recognize the C. I. O.

As related by Summersby, president and general manager of respondent—

A wage increase was announced March 31. After he met in his office on April 6, (the day of Nelson's discharge) with the committee of "jiggers," later the same day he was asked for a place in which the Federation's temporary committee could meet. He answered the request by saying, "You can have my office and make yourselves comfortable." That afternoon, as he was ready to leave, the temporary committee met in his office and he was "advised that they were organizing a local union . . . I told them that I would grant them the same privileges I would grant any other union . . ." Two days after recognizing the Federation, he placed and paid for an ad in a local paper, entitled "The Strike that Failed" because in part, as he said, "the B. D. A. Employees' Federation had formed and had taken the organization into their own hands, and had shown that they were still real citizens." Respondent is owned by an English concern and a statement by him appeared in the local paper, on April 25, disclosing the possibility of the company's moving the plant out of the United States if there were to be "labor uncertainties."

He recognized the Federation April 9, and on April 13, told the Federal Conciliator that an election could not be held, since the Federation had already been recognized. And on the 16th, Summersby told Salerno that his proposed T. W. O. C. contract would be taken up with Summersby's lawyer.

*Fifth. Designation of T. W. O. C. as bargaining agent.*

The court below found no substantial evidence to support the Board's finding that a majority of respondent's employees joined the T. W. O. C., or that "the T. W. O. C. . . . ever came into actual existence with authority to negotiate a contract with the respondent." Much of the testimony already referred to bore upon the genesis of T. W. O. C. at respondent's plant.

Schofield said:

By April 4 he had "four hundred and sixty-five or four hundred and sixty-seven" signed application cards "marked down." The cards were sent to Boston. A few men paid dues but collection was stopped. ". . . we had a majority of cards signed." Dues are not collected until management grants recognition. No local C. I. O. (T. W. O. C.) entity had been formed for the plant; "we had the fifty-one per cent, but this company union stuff and discharge and everything came along, and we have just had to wait for this hearing . . ."

Nelson stated that he told the timekeeper, on April 2, "It's all over but the shouting . . . We have well over sixty per cent signed up all ready." And from the testimony of an officer of the Federation it appeared that the C. I. O. drive resulted in a number of signatures, and that both organizations could possibly claim fifty-one per cent of the employees signed up.

As explained by the T. W. O. C. State Director—

A charter or local is unnecessary for membership in T. W. O. C.; no charter to a local is granted until after recognition. Members of the Federation are members in good standing of T. W. O. C., even if they have not paid dues or initiation fees. The T. W. O. C. cards were brought to him during the first week in April. Summersby, April 9, refused to agree to have the Federal Conciliator, or a third party, count the T. W. O. C. cards. Employees are eligible to membership in T. W. O. C., without formation of a plant local.

The T. W. O. C. Director's Secretary stated that the T. W. O. C. cards were brought in before April 12. It was agreed at the hearing that, after respondent checked against the original signed cards, T. W. O. C. had a list of four hundred and eighty-two names taken from those cards. And it was stipulated that these cards were signed "on or before April 10, 1937."

*Shift in membership.*

Respondent has contended before the Board, as here, that if the T. W. O. C. did actually represent a majority

of its employees on April 4 (as the Board found), a shift in membership had given the Federation a majority when the company on April 9 recognized it as exclusive bargaining representative. However, the Board found that "the record is clear that, had it not been for the unfair labor practices of the respondent in organizing and fostering the Federation and in persuading, intimidating and coercing its employees to join the Federation and leave the T. W. O. C., the respondent's employees would have remained members of the T. W. O. C." In view of the substantial support in the evidence for the Board's findings that the company intimidated and coerced its employees and dominated the Federation, the Board properly concluded that "The unfair labor practices of the respondent cannot operate to change the bargaining representative previously selected by the untrammelled will of the majority." [7] And, accordingly, the Board was justified in its finding "that on April 4, 1937, and at all times thereafter, the T. W. O. C., pursuant to Section 9 (a) of the Act, was the exclusive representative of all the employees in the appropriate unit for purposes of collective bargaining . . ."

*Sixth. The "Sit Down."*

As one of the apparently alternative grounds of its decision, the Circuit Court of Appeals declared the Board without authority to order reinstatement of Nelson and Schofield because of so-called unlawful conduct and the alleged incitement of a "sit down" strike within the meaning of the *Fansteel* case.[8] The opinion stated that "Nelson even threatened truck drivers delivering materials to the plant with violence, and to destroy the spur tracks over which materials were delivered to the plant, . . . The

---

[7] Cf. *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548, 557, 571, affirming 33 F. 2d 13, affirming 24 F. 2d 426; 25 *id.* 873; 25 *id.* 876, 877–8.

[8] *Labor Board* v. *Fansteel Corp.*, 306 U. S. 240.

affirmative action that is authorized is to make these remedies effective in the redress of the employees' rights, to assure them self-organization and freedom in representation, not to license them to commit tortious acts or to protect them from the appropriate consequences of unlawful conduct. We are of the opinion that to provide for the reinstatement or reemployment of employees guilty of the acts, which it is not denied were committed in this instance, would not only not effectuate the policy of the Act, but would directly tend to make abortive its plan for peaceable procedure."

We find no such issue raised by respondent's pleadings before the Board. Respondent made request for special findings by the Board, but included none that Nelson and Schofield had been guilty of any unlawful conduct. Nelson categorically denied having made threats of violence. The court was apparently referring to the testimony of a truck driver which appears in the record. An objection of the Board's representative to the introduction of this particular testimony was overruled by the trial examiner when respondent's attorney made the following statement: "If your Honor please, may I point out that while Mr. Nelson was on the witness stand in cross-examination I asked him if he did not say certain things at this time and place, that this witness has been referring to, which the witness Nelson denies. The testimony of this witness that Nelson did say those things is in contradiction of Mr. Nelson's testimony and is clearly admissible as tending to impeach the veracity of Mr. Nelson's testimony. Aside from that I also submit it as bearing on the type of conduct and the attitude of the representatives and organizers of this T. W. O. C. getting membership and conducting the affairs of this organization."

This truck driver's helper testified that on the morning of April 8, after Schofield and Nelson had been laid off, he saw Nelson, Schofield and a third "little fellow from the

C. I. O." "outside the mill yard." He noticed Nelson "going up and down motioning . . . Going like this [illustrating by waving arms, squatting and standing.]" As this truck driver recollected, Schofield was not "doing anything." "If anybody was looking out the east door they could" see Nelson or Schofield moving their hands that morning; Nelson "made a motion to sit down, that is all," out "on the main road going to the plant." He "couldn't say that" any workers would have seen Nelson; he "couldn't say that, whether they could see out or not. I don't know." An employee, not Nelson or Schofield, who "went through the department shouting 'Sit-down strike,' " was taken for an automobile ride by the company's vice president, talked to, given lunch and sent home to bed without loss of pay and was still working for the company at the time of the hearing. When asked, "You remember you said, 'Well, we can blow up the railroad?'," Nelson answered, "No, absolutely not."

In vacating the Board's order of reinstatement on the ground that undenied evidence showed that Nelson and Schofield had, after their unlawful discharge, incited or threatened unlawful conduct, the court acted without any justification.

Congress has placed the power to administer the National Labor Relations Act in the Labor Board, subject to the supervisory powers of the Courts of Appeals as the Act sets out. If the Board has acted within the compass of the power given it by Congress, has, on a charge of unfair labor practice, held a "hearing," which the statute requires, comporting with the standards of fairness inherent in procedural due process, has made findings based upon substantial evidence and has ordered an appropriate remedy, a like obedience to the statutory law on the part of the Court of Appeals requires the court to grant enforcement of the Board's order. Until granted such enforcement, the Board is powerless to act upon the parties

before it. And the proper working of the scheme fashioned by Congress to determine industrial controversies fairly and peaceably demands that the courts quite as much as the administrative body act as Congress has required.

Mindful of the separate responsibilities Congress has imposed upon the Board and the courts, we have carefully scrutinized this entire record. Within the range of our examination has appeared not merely the testimony but also the procedure followed from the filing of the charge before the Board to final decree of the Court of Appeals. The Board and its representatives solicitously guarded respondent's and intervenor's right to a full and fair hearing; manifested liberality in ruling upon evidence proposed by both sides; and conducted the proceedings in a manner calculated to bring about a just result. And as we have pointed out, substantial evidence supported the result which the Board did reach.[9] Notwithstanding, the court below declined to order enforcement of the Board's order, and the implications of its opinion are that the Board without a proper regard for either the limitations on its power or the evidence made findings all of which had no substantial support.

But in reaching this conclusion the Court of Appeals itself failed to give proper regard to the evidence which was before the Board, which appeared in the record before the court and which we have set out in this opinion. In refusing to enforce the Board's order, the court exceeded the power given it. The cause is reversed and remanded with directions to enforce the Board's order without conditions or qualifications.

*Reversed.*

Mr. Justice McReynolds took no part in the consideration or decision of this case.

---

[9] Accepting the underlying findings of the Board, as we do, it was within the province of the Board to draw the inferences that the

guarantees of § 7 of the Act required disestablishment of the Federation (*Falk* case, 308 U. S. 461, and cases cited), and that posting of appropriate notices was necessary.   *Id.*, p. 462.