## PUEBLO GAS & FUEL CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 2147.

Circuit Court of Appeals, Tenth Circuit.

March 12, 1941.

Donald C. McCreery, of Denver, Colo. (Paul W. Lee, George H. Shaw, and Wm. A. Bryans, III, all of Denver, Colo., on. the brief), for petitioner.

Charles A. Graham, of Denver Colo. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Richard C. Barrett and Nanette Dembitz, Attys., National Labor Relations Board, all of

Washington, D. C., on the brief), for respondent.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

In this proceeding the Pueblo Gas & Fuel Company[1] asks us to review and set aside an order of the National Labor Relations Board[2] entered against it pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. The Board in its answer seeks enforcement of its order. The order provides that Petitioner:

"1. Cease and desist from:

"(a) Refusing to bargain collectively with International Brotherhood of Electrical Workers, Local Union No. 667-B, as the exclusive representative of all employees in the operating department of the respondent, including foremen, but excluding the superintendent, the general street foreman, and clerical employees;

"(b) In any other manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Upon request bargain collectively with International Brotherhood of Electrical Workers, Local Union No. 667-B, as the exclusive representative of all employees in the operating department of the respondent, including foremen, but excluding the superintendent, the general street foreman, and clerical employees, in respect to rates of pay, wages, hours of employment, and other conditions of employment;

"(b) Post immediately in conspicuous places in its premises, and maintain for a period of at least sixty (60) consecutive days from the date of the posting, notices to its employees stating: (1) that the respondent will not engage in the conduct from which it is ordered to cease and desist in paragraphs 1(a) and (b) of this Order; and (2) that the respondent will take the affirmative action set forth in paragraph 2(a) of this Order; and (3) that the respondent's employees are free to become or remain members of International Brotherhood of Electrical Workers, Local Union No. 667-B;

"(c) Notify the Regional Director for the Twenty-second Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith."

It is urged: 1st, that the Board is without jurisdiction in the matter; 2nd, that the findings of the Board are not supported by substantial evidence; and, 3rd, that the proposed bargaining agency is inappropriate and illegal and not a proper bargaining agency.

■ *Jurisdiction:* Before the Board may exercise jurisdiction it must appear either that the industry under consideration is engaged in interstate commerce or that its intrastate business is of such a nature that disturbance thereof would substantially affect interstate commerce. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L. Ed. 126; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Southern Colo. Power Co., 10 Cir., 111 F.2d 539; National Labor Relations Board v. Hearst, 9 Cir., 102 F.2d 658.

Petitioner is a corporation engaged in distributing natural gas and gas appliances in Pueblo, Colorado. It operates only in Pueblo and vicinity, and sells no gas, appliances or merchandise outside the state of Colorado.

It receives its entire supply of gas from the Colorado Interstate Gas Company, through a pipeline that carries the gas from the Texas fields to the city gates where it enters Petitioner's distributing system. During the first nine months of 1939, Petitioner purchased 351,866 thousand cubic feet of gas, for which it paid the sum of $123,849.27. Of this amount, 103,358 thousand cubic feet was sold to business con-

---

[1] Herein referred to as Petitioner.

[2] Herein referred to as the Board.

cerns in Pueblo, Colorado, largely engaged in intrastate commerce, but most of them also transacting an appreciable amount of interstate commerce. The following are among some of the industrial concerns to whom Petitioner sold its gas: The Continental Baking Company, Rainbo Bakers, Inc., Summit Pressed Brick Company, the N. O. Nelson Mfg. Co., The Pueblo Star Journal and Chieftan, a morning and evening paper, and Crane-O'Fallon Co., a distributor of plumbing and heating appliances. The amount of the interstate business of these industries varies from six to sixteen per cent of their total business transacted. Petitioner also furnishes gas to the Nuckolls Packing Company, forty per cent of whose business is interstate, and to the Mountain States Telephone and Telegraph Company, as well as to other industries that do some interstate business. During the first eight months of 1939, Petitioner purchased equipment for its own use in the approximate amount of $28,500, of which $1,400 was purchased outside the state. During the same period Petitioner also purchased merchandise and appliances for resale in the approximate amount of $35,000, of which $4,600 was purchased outside the state.

Nearly all of the industries served by Petitioner have stand-by heating equipment which could be used if the gas supply furnished by Petitioner were interrupted. A few have no such equipment. In some instances it would be required that the gas burners be removed and coal burner equipment installed. In the case of the two newspapers, it would be necessary to substitute electricity for gas.

All the gas received by Petitioner comes from outside the state of Colorado. It flows directly from the gas wells in Texas through the pipeline of the Colorado Interstate Gas Company and Petitioner's distributing system in a continuous flow to the burner tips of the customers. The transaction by which Petitioner receives its supply of gas is interstate in character and is substantial in amount. Obviously, a labor dispute in Petitioner's plant interrupting its business would affect this interstate commerce.

■ Furthermore, nearly all of the industrial users of gas served by Petitioner are engaged in interstate commerce and while, with the exception of the Nuckolls Packing Company, the relative amount of interstate commerce of these industries is small, it is appreciable, and sufficient to directly bear on interstate commerce. While most of these users have stand-by heating equipment which could be used in the event of an interruption of the flow of gas, it may be open to doubt that such equipment would obviate the detrimental effects a labor dispute in Petitioner's plant would have on interstate commerce. Generally, stand-by heating equipment may well be regarded as emergency equipment for temporary use rather than for permanent use. In many instances, rearrangements would be necessary in plants that were using gas, such as replacing gas burners with coal burners. This in itself would affect interstate commerce.

Nor is it an answer to the question of jurisdiction to say that if a labor dispute in Petitioner's plant cut off the supply of gas from Petitioner's customers engaged in interstate commerce, they could obtain a supply of heat energy from those who had coal to sell or that the newspapers that have no substitute equipment could resort to electricity. These industries are engaged in interstate commerce. They have determined the best method of conducting that commerce and any outside act that would compel them to change their mode of operation would affect such business. The jurisdiction of the Board may not be defeated by the contention that if interstate commerce is disrupted, other means exist whereby it may be carried on. National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 326, 60 S.Ct. 918, 84 L.Ed. 1226; Virginian Ry. Co. v. System Federation, 300 U.S. 515, 557, 57 S.Ct. 592, 81 L.Ed. 789; National Labor Relations Board v. Henry Levaur, Inc., 1 Cir., 115 F.2d 105, 109; Cudahy Packing Co. v. National Labor Relations Board, 10 Cir., 118 F.2d 295, decided Jan. 30, 1941.

■ *Unfair Labor Practices:* International Brotherhood of Electrical Workers, Local Union 667-B[3] is a local union chartered by the International Brotherhood of Electrical Workers, affiliated with the American Federation of Labor. Its total membership exceeds 300. All its members, save those employed by Petitioner, are employed by electrical utility companies. The Local Union began organizing activities among the employees in the operating de-

---

[3] Herein referred to as Local Union.

partment of Petitioner's plant in the latter part of April, 1939, and on May 6, 1939, held a meeting at which a number of employees signed preliminary applications for membership in the Local Union. The following week, on May 13, 1939, fifteen out of the twenty-two employees in Petitioner's operating department were initiated into membership in the union.

While organization activities were going on, T. C. Calvert, superintendent of the operating department of Petitioner's plant, exhibited active opposition to membership in the Local Union. He asked Earl B. McGill, an employee: "Just what are you fellows trying to do to get into the union? What organization are you getting in with? . . . the plumbers or who? . . ." On being informed that it was the electrical workers, Calvert replied: "You had better be careful in getting into this organization because we might not be able to do some certain types of work that the plumbers might and the plumbers might take some of our work away from us." He asked Arthur D. Melvin, one of Petitioner's employees, whether he would vote in favor of the union at the union meeting to be held the next day, and warned him by saying: "You had better be careful because just the older ones might be working." He also stated to George W. Reynolds, an employee, that Petitioner had had a meeting in Denver and had decided that there would be no union and that he had informed Reynolds of this so that he would not get into any trouble. During this time McGill was summoned to the office of C. G. Keeler, manager and president of Petitioner, to discuss union activities. When McGill informed Keeler that he was a member of the union, Keeler remarked: "Well, I have been watching the front door all the time and the boys in the back are going to force me to close the doors." While the union was being formed, Calvert on one occasion asked Winthrop D. Sylvester, an employee eligible for union membership, to get in his car. They drove away and Calvert asked Sylvester if he was going to join the union, and when Sylvester replied that he was, Calvert stated that Petitioner would not recognize the union or have anything to do with it. On May 16, 1939, after a majority of Petitioner's employees had joined the Local Union, L. B. Morrell, business representative of the Local Union, called on Keeler and requested recognition of the Local

Union as the bargaining agent of the employees in Petitioner's operating department. He testified that Keeler replied that he would not recognize any labor organization. From this testimony the Board found that Petitioner had interfered with, restrained and coerced the employees in the exercise of their rights guaranteed by Section 7 of the Act, and had refused to bargain with the representatives selected by the employees, in violation of the provisions of Section 8(5).

Petitioner asserts that the coercive conduct found by the Board to exist had ceased before the completion of unionization of the employees and that therefore no unfair labor practice existed justifying the Board's order. The fact that the coercive conduct had ceased, however, does not prevent the Board from barring its resumption. Consolidated Edison Co. v. National Labor Relations Board, supra. It is now well settled that a refusal to bargain in violation of Section 8(5) of the Act is likewise a violation of Section 8(1) and as such warrants the Board's order to cease and desist from interference, restraint and coercion. Art Metals Construction Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148; National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632; National Labor Relations Board v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 18.

*Union Not Proper Bargaining Agency:* Petitioner now bases its refusal to bargain with the Local Union on two grounds: 1—that under the constitution of International Brotherhood of Electrical Workers the employees of a gas distributing system are not entitled to membership in an electrical union, and also that under the constitution of the Local Union the employees of Petitioner are not entitled to membership therein, and that therefore the Local Union is legally incompetent to act as bargaining agency of the employees; and, 2—that Petitioner may not lawfully be required to bargain with the Local Union, a majority of whose members are employees of a rival industry. Petitioner's original refusal to bargain was based on other grounds.

The authority of the bargaining agency to represent the employees must be sought in the consent of the employees and not in the constitution of a national labor organization providing for the organiza-

tion of local units. The Act confers upon the employees the right to designate a proper bargaining representative to represent them in their dealings with the employer. 29 U.S.C.A. § 159(a). The term "representative" includes any individual or labor organization. 29 U.S.C.A. § 152(4). A "labor organization" is defined as "Any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C.A. § 152(5). The Local Union is within the compass of bargaining representatives as defined by the Act.

It is admitted that Petitioner's employees did designate the Local Union as the bargaining agency. Whether they are members of the Local Union or even entitled to membership therein is of no moment. National Labor Relations Board v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473, 478 (Certiorari granted on another point, 61 S.Ct. 72, 85 L.Ed. ——); Fort Wayne Corrugated Paper Co. v. National Labor Relations Board, 7 Cir., 111 F.2d 869.

Petitioner asserts that the Local Union is an inappropriate bargaining unit because a majority of its members are employes of a rival industry. It argues that this union might attempt to force upon Petitioner bargaining terms advantageous to an electric utility and therefore disadvantageous to a competing utility engaged in the distribution of natural gas. An employer is bound to deal with any union which represents a majority of its employees, regardless of whether it also represents employees in a rival industry. The argument that such a union may force bargaining terms on Petitioner disadvantageous to itself is untenable, because under the Act an employer is not obligated to agree to any terms proposed by the bargaining agency disadvantageous to itself. National Labor Relations Board v. Jones & Laughlin Steel Corp., supra.

The order of the Board is affirmed and will be enforced.

PHILLIPS, Circuit Judge, concurs in the result.