**NATIONAL LABOR RELATIONS BOARD v. EL DORADO WATER CO., Inc.**

No. 14484.

United States Court of Appeals, Eighth Circuit.

April 30, 1952.

Rehearing Denied June 16, 1952.

Rosanna A. Blake, National Labor Relations Board, Takoma Park, Md. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, and A. Norman Somers, Asst. General Counsel, National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

William M. Clark, Little Rock, Ark. (House, Moses & Holmes, Little Rock, Ark., on the brief), for respondent.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

COLLET, Circuit Judge.

The only question presented upon this petition of the National Labor Relations Board to enforce its order directed to the respondent El Dorado Water Company, Inc., is whether respondent is engaged in commerce within the meaning of the Na-

tional Labor Relations Act, 29 U.S.C.A. § 151 et seq., and is thereby subject to the Labor Board's jurisdiction.

Many of the facts were stipulated. The remainder are not in dispute. The Board reached the conclusion that the respondent company, a privately-owned public utility operating only in the city of El Dorado, Arkansas, one of approximately thirty corporations, variously located in eleven states, all engaged in the distribution and sale of water, the outstanding stock of all of which is owned by the General Waterworks Corporation, and the General Waterworks Corporation furnishing its subsidiaries, including respondent, with engineering and accounting services and legal advice, and handling their finances, is engaged in "commerce", mainly upon the ground that all the companies are "integrated". We deem considerations other than "integration" of more controlling importance, as will be hereafter noted.

We adopt the following portion of the trial examiner's statement of the facts:

"El Dorado Water Company, Inc., is an Arkansas corporation, having its principal place of business in El Dorado, Arkansas, where it is engaged in pumping, storing, and selling water. The Respondent is a wholly owned subsidiary of the General Waterworks Corporation, a Delaware corporation with general offices in Pine Bluff, Arkansas, and a home office in Philadelphia, Pennsylvania.[1] The General Waterworks Corporation is both a parent and a direct operating company. As a direct operating company, it operates the waterworks system of Pine Bluff, Arkansas. As a parent company, it owns all the outstanding stock of some 30 other water companies located in 10 [other] states, 13 of these companies being located in Arkansas and one of them being the Respondent. It also owns, directly or through its subsidiary, the National Telephone

1. "The Respondent's directors are all on the board of directors of the General Waterworks Corporation. Three of the four corporate officers of the Respondent are also corporate officers of the General Waterworks Corporation. However, a resident local manager is in charge of the Respondent's day-to-day operations and the carrying out of the Respondent's business with its customers."

Company, all the stock of telephone companies operating in some 160 communities, none of which is located in Arkansas. The General Waterworks Company performs various services for its subsidiaries, including the Respondent, such as engineering and accounting services, legal advice, and the handling of all finances.

"During the year 1949, the Respondent purchased approximately $10,000 worth of materials and supplies locally in El Dorado, Arkansas. In addition, the General Waterworks Corporation purchased for the account of the Respondent $73,234.90 worth of materials and supplies, of which amount $65,748.72 was for materials and supplies purchased outside the State of Arkansas. During the same year, the Respondent produced from wells located in El Dorado, Arkansas, and sold and delivered locally in El Dorado and its immediate environs, water having a sales value of $190,000, none of which was sold and delivered outside the State of Arkansas. Approximately $182,000 of such sales or 95.9 per cent of its total sales was to small users, mostly domestic users. However, water valued at $7,856.37, or 4.1 per cent of the Respondent's total sales, was sold to various industrial purchasers in El Dorado. Among such industrial purchasers were some that are engaged in interstate commerce or in the production of goods for interstate commerce. Thus, sales to industrial consumers in 1949 included water of the value of approximately $3100 sold to the Missouri Pacific Railroad Company, an interstate carrier, for use in connection with its roundhouse and washing rack operations at El Dorado.[2] Such sales also included water of the value of approximately $595 to a baking company,

which sells part of its products outside the State of Arkansas, for use in connection with its manufacturing operations and cooling system. Substantially all other sales to industrial consumers were for local drinking purposes."

It further appears that the industrial purchasers which use water for other than drinking purposes on their premises within the city of El Dorado are the El Dorado Baking Company, the Lion Oil Company, and the Missouri Pacific Railroad Company. Of the $595 worth of water used by the baking company during 1949, some was for drinking purposes, some was used in its processing in the manufacture of bread, and some in the operation of an air-conditioning system. The amount of bread which was sold outside of Arkansas is not definitely fixed but did not exceed 10 per cent of the baking company's total sales. The water sold to the Lion Oil Company for other than drinking purposes on its premises amounted to $57.03 in 1949 and was used in the operation of an air-conditioning plant in its advertising department in El Dorado and for one shower bath. The water used by the Missouri Pacific Railroad Company that year for other than drinking purposes was purchased because its own source of water was temporarily out of commission, with the possibility of not being rehabilitated because of the convenience of respondent's water.

Respondent's plant was operated by a local manager entirely independent of the operation of the General Waterworks Corporation's other properties except as heretofore stated. The testimony is that respondent's plant could be closed down permanently without affecting the operation of any of the other properties belonging to the General Waterworks Corporation. The material and supplies purchased by the General Waterworks Corporation for respondent during the year 1949 were for supplies for

2. "The Respondent adduced evidence that the Missouri Pacific Railroad also had its own sources of water adequate for its needs at Kenova, Arkansas, some 10 miles from El Dorado, and at Felsenthal, Arkansas, some 30 miles from El Dorado. But the fact that the Respondent's product may be secured elsewhere in the event

of a stoppage of the Respondent's operations is immaterial and 'may not be considered in determining the jurisdiction of the Board.' Cudahy Packing Co. v. N. L. R. B., 10 Cir., 118 F.2d 295, 299. See also N. L. R. B. v. Bradford Dyeing Association, 310 U.S. 318, 326, 60 S.Ct. 918, 84 L.Ed. 1226.

the operation of respondent's plant as distinguished from raw materials going into the product produced, and consisted principally of pipe for use in maintenance and permanent additions and betterments of the water plant. The purchases for 1949 are not representative of what the cost of materials and supplies in any other year may be, as those purchases vary widely from year to year, depending upon respondent's maintenance and expansion requirements. The City of El Dorado had a population in 1950 of 23,000. The unfair labor practice which petitioner seeks to correct is respondent's refusal to bargain with the union representatives of two units of its employees on the ground that the Act is not applicable to it. One of those units consists of fifteen employees; the other six.

■ The amount of respondent's water which is furnished to industrial consumers which use it in connection with interstate commerce is comparatively negligible. But the absence of any appreciable participation in "commerce" will not exclude respondent from the application of the Act if respondent's business has such a relation to "commerce" that labor disputes therein would obstruct or burden "commerce." In N. L. R. B. v. Fainblatt, 306 U.S. 601, 604, 608, 307 U.S. 609, 59 S.Ct. 668, 670, 83 L.Ed. 1014, the Supreme Court said:

"It has been settled by repeated decisions of this Court that an employer may be subject to the National Labor Relations Act although not himself engaged in commerce. The end sought in the enactment of the statute was the prevention of the disturbance to interstate commerce consequent upon strikes and labor disputes induced or likely to be induced because of unfair labor practices named in the Act. That those consequences may ensue from strikes of the employees of manufacturers who are not engaged in interstate commerce where the cessation of manufacture necessarily results in the cessation of the movement of the manufactured product in interstate commerce, has been repeatedly pointed out by this Court. * * * Long before the enactment of the National Labor Relations Act it had been many times held by this Court that the power of Congress extends to the protection of interstate commerce from interference or injury due to activities which are wholly intrastate."

And

"In this, as in every other case, the test of the Board's jurisdiction is not the volume of the interstate commerce which may be affected, but the existence of a relationship of the employer and his employees to the commerce such that, to paraphrase § 10(a) in the light of constitutional limitations, unfair labor practices have led or tended to lead 'to a labor dispute burdening or obstructing commerce'."

See also J. L. Brandeis & Sons v. N. L. R. B., 8 Cir., 142 F.2d 977; N. L. R. B. v. Dixon, 8 Cir., 184 F.2d 521. In J. L. Brandeis & Sons v. N. L. R. B. this Court said 142 F.2d loc. cit. 980:

"In brief, the jurisdictional test in such a case as the present one is whether the stoppage of the business by reason of labor strife would tend substantially to affect interstate commerce. The principle applicable is one of degree. When the unfair labor practice involved is found to have such a close and substantial relation to the free flow of interstate commerce that the practice tends to obstruct that commerce, the jurisdiction of the Board to apply the preventive remedies of the Act is undoubted."

While it appears unlikely that any disruption in the operation of respondent's water plant would have a very appreciable effect upon the interstate business of the Missouri Pacific or the bakery company, the question is not at all free from doubt. Therefore, since there are clear and compelling reasons why the Board's jurisdiction must be affirmed, we pass this question without determination.

■ Did the acquisition by respondent of a large part of its supplies used in the operation, maintenance and expansion of its plant from outside the State of Arkansas bring it within the purview of the Act? The facts in the case at bar distinguish it

954

from the following cited cases, where raw materials were shipped in interstate commerce to a plant, were processed, and again shipped out in interstate commerce. N. L. R. B. v. Dixon, 8 Cir., 184 F.2d 521; N. L. R. B. v. Pearlstone, 8 Cir., 115 F.2d 132; N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; N. L. R. B. v. Central Missouri Telephone Co., 8 Cir., 115 F.2d 563; N. L. R. B. v. Crowe Coal Co., 8 Cir., 104 F.2d 633. Here materials and supplies amounting to approximately $65,000 were shipped into Arkansas from outstate for use by respondent in the operation of its plant to supply local users of water. And the present question is whether the stoppage of those imports occasioned by labor difficulties in respondent's plant would have such a bearing on commerce as to bring respondent within the Act.

We find that the Supreme Court has decided the question in N. L. R. B. v. Denver Bldg. Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. In that case a subcontractor for the performance of electrical work in the construction of a building in Denver, Colorado, had purchased materials of the value of $55,745.25 outside of Colorado in the year the subcontract was let. The subcontractor's employees were nonunion. The contractor's employees were all union members. The union to which the contractor's employees belonged called the union men off the job until the contractor terminated its contract with the subcontractor. The contractor complied, terminating the contract, and the subcontractor complained to the National Labor Relations Board that the union was engaging in a secondary boycott. The Board so found and ordered the union to discontinue the boycott. The jurisdiction of the Board was challenged on the ground that the activities of the union complained of—which had the effect of stopping the subcontractor's work on the building—did not affect interstate commerce. The Court said:

"The Board found that, in 1947, Gould & Preisner purchased $86,560.30 of raw materials, of which $55,745.25, or about 65%, were purchased outside of Colorado. Also, most of the mer-

chandise it purchased in Colorado had been produced outside of that State. While Gould & Preisner performed no services outside of Colorado, it shipped $5,000 of its products outside of that State. Up to the time when its services were discontinued on the instant project, it had expended on it about $315 for labor and about $350 for materials. On a 65% basis, $225 of those materials would be from out of the State. The Board adopted its examiner's finding that any widespread application of the practices here charged might well result *in substantially decreasing the influx of materials into Colorado from outside the State and it recognized that Gould & Preisner's annual purchase of over $55,000 of such materials was not negligible.* (Italics ours.)

"The Board also adopted the finding that the activities complained of had a close, intimate and substantial relation to trade, traffic and commerce among the states and that they tended to lead, and had led, to labor disputes burdening and obstructing commerce and the free flow of commerce. The fact that the instant building, after its completion, might be used only for local purposes does not alter the fact that its construction, as distinguished from its later use, affected interstate commerce."

We observe no distinction in principle between the factual situation in the Denver Bldg. Council case and that presented by this record. Here the materials imported from outstate were for use in the maintenance and improvement of the plant which is used for local purposes. There the materials were imported by the subcontractor who was engaged in constructing a building [or plant] which, inferentially, was for local use. The fact that the subcontractor had imported materials in a considerable amount for the construction or "production" of a building for local use, and was engaged in that undertaking, was held sufficient to bring the subcontractor's activities into such a close, intimate and substantial relation to trade, traffic and commerce among the states as to bring the subcontractor's activities within the purview of

the Act. The respondent's importations were for the same purpose, were in a substantially equal, and comparatively greater, amount, and must be given the same legal effect.

In view of the conclusion above stated, it is unnecessary to discuss other arguments presented on the question of the Board's jurisdiction. The petition for a decree of enforcement of the Board's order is therefore granted.