**EAGLE–PICHER MINING & SMELTING CO. et al. v. NATIONAL LABOR RELATIONS BOARD (INTERNATIONAL UNION OF MINE, MILL & SMELTER WORKERS, LOCALS NOS. 15, 17, 107, 108, AND 111, Intervener).**

**No. 460, Original.**

Circuit Court of Appeals, Eighth Circuit.

May 21, 1941.

Rehearing Denied June 9, 1941.

SANBORN, Circuit Judge, dissenting in part.

John G. Madden, of Kansas City, Mo. (A. C. Wallace, of Miami, Okl., H. W. Blair, of Washington, D. C., and Alfred Kuraner and Madden, Freeman & Madden, all of Kansas City, Mo., on the brief), for petitioners.

Gerhard P. Van Arkel, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, National Labor Relations Board, Laurence A. Knapp, Asst. Gen. Counsel, National Labor Relations Board, and Mortimer B. Wolf, Owsley Vose, and Helen F. Humphrey, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Louis N. Wolf, of Joplin, Mo. (Sylvan Bruner, of Pittsburg, Kan., on petition for intervention), for intervener International Union of Mine, Mill & Smelter Workers, Locals Nos. 15, 17, 107, 108 and 111.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

The order of the National Labor Relations Board, which the petitioners seek to invalidate and the respondent asks to have enforced, requires the petitioners to cease and desist from dominating, supporting or favoring the Tri-State Metal Mine and Smelter Workers Union [1] (here-

---

[1] This Union is sometimes referred to in the Board's decision and order as "Tri-State Mine, Mill & Smelter Workers Union."

inafter called Tri-State Union), or the Blue Card Union of Zinc & Lead Mine, Mill and Smelter Workers (hereinafter called Blue Card Union); from encouraging their employees to join those unions or any other union; from discouraging their employees from joining the International Union of Mine, Mill & Smelter Workers, Locals Nos. 15, 17, 107, 108 and 111 (hereinafter called International Union); from giving effect to any contract with the Tri-State Union; from dealing with the Blue Card Union as exclusive representative of petitioners' employees, unless certified by the Board to be such representative; from recognizing the Blue Card Union as representative of any of their employees unless similar recognition is accorded to the International Union or unless the Blue Card Union is certified by the Board to be the exclusive representative of petitioners' employees; from instigating or encouraging the use of violence against the members of the International Union; and from interfering in any way with the rights of petitioners' employees with respect to self-organization and collective bargaining. The order of the Board, for the purpose of effectuating the policy of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., further requires petitioners to take certain affirmative action, which includes the reinstatement of two discharged employees, with back wages, and also includes the payment of back wages, together with reinstatement or preferential treatment, to more than two hundred other employees who were found by the Board to have been refused reinstatement because of their union activities and affiliations.

This controversy had its inception in a strike called by the International Union on May 8, 1935, prior to the approval of the National Labor Relations Act on July 5, 1935. This strike closed the mines, mills and smelters in a large lead and zinc producing area known as the Tri-State District, being composed of parts of southwestern Missouri, northeastern Oklahoma, and southeastern Kansas and comprising an area approximately forty miles long and ten miles wide. A back-to-work movement followed the strike, and this caused the formation of the Tri-State Union in the latter part of May, 1935, the main purpose of which was to reopen and keep open the mines, mills and smelters in this area. The back-to-work movement succeeded, and the strike of the International Union failed, although it was never formally terminated.

After the National Labor Relations Act became effective (July 5, 1935), the International Union filed charges with the Board accusing the petitioners of unfair labor practices within the meaning of § 8(1), (3), and (5) and § 2(6) and (7) of the Act. The Board issued its complaint upon these charges, alleging that petitioners had violated the Act by: (1) Refusing to accept the International Union as the exclusive representative of their employees for purposes of collective bargaining, although the Union represented a majority of their employees; (2) locking out their employees; (3) dominating and supporting the Tri-State Union; (4) instigating and encouraging the use of violence against members of the International Union; (5) making membership in the Tri-State Union a condition of employment; (6) discriminating against the employees listed in the complaint with respect to employment because of their union activities and affiliations. The petitioners denied these charges and alleged that the Tri-State Union was dissolved in 1937, and that the Blue Card Union had been organized shortly thereafter and had become affiliated with the American Federation of Labor. A hearing was held at Joplin, Missouri, before William R. Ringer, who was appointed Trial Examiner by the Board. His conduct of this hearing, which lasted from December 6, 1937, to April 29, 1938, is deserving of the highest commendation. The Examiner in his Intermediate Report absolved the petitioners from having committed an unfair labor practice in refusing to recognize the International Union as the sole representative of the employees for purposes of collective bargaining. He also found that petitioners had not locked out their employees. He found that petitioners had dominated and supported the Tri-State Union and its successor, the Blue Card Union; that petitioners had made membership in the Tri-State Union and in its successor a condition of employment; that petitioners were in part responsible for the use of violence which occurred during the strike and the back-to-work movement; that there were discriminatory discharges and discriminatory refusals of reinstatement with respect to many of the employees listed in the complaint. He recommended what he considered an appropriate order in the light of his findings and conclusions. The petitioners and the International Union filed

exceptions to the Examiner's report, and these were argued before the Board, which thereafter filed its decision and entered the order complained of by petitioners.

The petitioners challenge the order of the Board upon the following grounds: (1) That the findings that the petitioners dominated and supported the Tri-State Union and the Blue Card Union are not within the pleadings and are unsupported by substantial evidence; (2) that the findings that petitioners were responsible for the violence used against members of the International Union are not within the pleadings and are unsupported by substantial evidence; (3) that the Board was without authority to require the reinstatement of any of the employees listed in the complaint (referred to as claimants), because the labor dispute in consequence of which their work had ceased was not current at the time the Board took jurisdiction and the claimants were not then employees within the meaning of the Act; (4) that the findings of the Board with respect to the alleged discriminatory discharge of a claimant named Sheppard are not within the pleadings and are unsupported by substantial evidence, and that the order of the Board requiring the reinstatement of Sheppard with back pay is unsupported by the evidence and unauthorized; (5) that the order of the Board is in all respects arbitrary, unsupported by substantial evidence, and unauthorized by law.

For convenience, the contentions of the petitioners will be considered under two classifications: (1) Those which relate to the alleged unfair labor practices from which petitioners are ordered to cease and desist; and (2) those which relate to the alleged discriminatory discharges and refusals to reinstate.

■ Without making this opinion unreasonably long, it is not possible to state in detail the facts or the evidence. Many of the facts are not in substantial dispute, and since the only function of this Court is to determine whether the Board, acting within the compass of its power, has held a proper hearing, has made findings based upon substantial evidence, and has ordered an appropriate remedy (National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 342, 60 S.Ct. 918, 84 L.Ed. 1226), we shall refer to the facts only so far as absolutely necessary for the purpose of this opinion.

The petitioners are large operators in the Tri-State District, are engaged in interstate commerce, and are subject to the National Labor Relations Act. The Eagle-Picher Lead Company (hereinafter called the Lead Company) is an Ohio corporation, having its principal place of business in Cincinnati, Ohio, and is engaged in the mining and smelting of lead and zinc ores, the refining of lead and zinc, and the manufacture of lead and zinc products. It has a large manufacturing plant at Joplin, Missouri, and other plants in other states. The Eagle-Picher Mining & Smelting Company, a Delaware corporation, is a wholly owned subsidiary of the Lead Company, and owns, leases and operates mines in the Tri-State District. It has a lead smelter at Galena, Kansas, a zinc smelter at Henryetta, Oklahoma, and a "Central Mill" at Picher, Oklahoma. There are all together approximately fifty different operators of mills, mines or smelters in the District, who employ in the aggregate about 7,000 men. Wages and employment apparently vary with the market for lead and zinc.

The International Union is a labor organization which in 1935 was affiliated with the American Federation of Labor (A. F. of L.). In 1936 it became affiliated with the Committee for Industrial Organization (C. I. O.). The International Union admits to membership persons working in mines, mills and smelters who do not hold executive or supervisory positions. Early in 1935 it had procured members from among the employees of the various operators in the Tri-State District, including the petitioners.

Petitioners' mines, mills and smelters in 1934 and up to May, 1935, were operated upon an open-shop basis. Petitioners had not discouraged their employees from joining the International Union. In March, 1935, a committee from the International Union—without presenting credentials and without producing any evidence that a majority of petitioners' employees had joined the International Union—sought recognition of the Union as the exclusive representative of all of the petitioners' employees; this in an interview with the management of the Galena Smelter of the Mining Company. The petitioners did not refuse to deal with any accredited committee of the International Union as the representative of all of their employees who were members of that Union, but declined to deal with the Union as the sole representative of all of petitioners' employees. On March 13, 1935, the International Union, by letter directed to all of the operators in the Tri-State District, suggested that the operators appoint a

committee to bargain with a committee of the International Union on behalf of all of their employees in the Tri-State District as a unit. Apparently no conferences were thereafter sought with the operators. There was no complaint made about wages, hours or working conditions, and the sole demand of the International Union was that it be recognized by the operators in the District as the exclusive bargaining representative of all of the employees of all the operators. The International Union then took a secret strike vote, at which some 700 of its members voted, about 600 of them in favor of a strike to enforce the demand of the Union. A strike was called, to become effective May 8, 1935, at midnight. The petitioners received their first notice of the strike at about three o'clock in the afternoon of May 8, 1935. They then made preparations to, and did, close down their mines, mills and smelters at midnight. The strike was directed at all operators in the District. It closed virtually all of the mines, mills and smelters, and threw almost all of the employees out of work. Times had been hard, the market for zinc and lead had been poor, wages had been low, and in a short time those dependent upon the mines, mills and smelters for a livelihood were in distress. Some relief was afforded by the International Union to its members, and the Red Cross furnished some help generally.

The back-to-work movement started in the latter part of May. This was, naturally, resisted by the International Union. F. W. Evans, a mine operator and employer of labor on good terms with employers and employees alike, was the leader in this movement. On May 24, 1935, he and 27 other men met on the open prairie near Quapaw, Oklahoma, to devise ways and means of ending the strike and reopening the mines, mills and smelters. Among the 28 men at this meeting there were three ground bosses of petitioner Mining Company and a number of ground bosses and foremen of other operators. On the afternoon of the same day, a back-to-work meeting was held by about 250 persons who met in Miami, Oklahoma, and the formation of an organization to reopen the various properties was proposed. Evans was the leader at this meeting. This was followed by a larger meeting on May 26, and by a still larger meeting on May 27, at which there was an attendance of about 3,000 persons. The Tri-State Union was organized at this meeting by adopting articles of association which had already been drafted and had been signed by twelve men, including Evans and six ground bosses, two of whom were employed by petitioner Mining Company.

Under the constitution of the Tri-State Union, any white male eighteen years old who had worked in any capacity in the lead or zinc mines, mills or smelters in the District was eligible for membership. To be on the executive committee, a member was required to have had five years experience "as a vice-principal" in the metal mines or smelters, and the same requirement was made with respect to any officer of a subordinate association. The twelve signers of the articles of association were elected by the organizers of the Tri-State Union as the executive committee of that Union, and the members of the executive committee chose F. W. Evans as president of the Union.

After the adjournment of the meeting of May 27, 1935, many of those who had attended it went to Picher, Oklahoma, armed with pick handles, and paraded the streets. This parade was marked by excitement and disorder. The Oklahoma State Militia was called out, and the next day, under its protection, the mines, mills and smelters commenced to reopen, although they were still being picketed by the International Union.

The petitioner Mining Company on June 28, 1935, made an attempt to reopen its Galena, Kansas, smelter. It was being picketed by the International Union, and the attempt to reopen it produced violence and gunfire. The smelter was in a virtual state of seige until martial law was declared by the Governor of Kansas, and the Kansas Militia took over, on June 29, 1935. Some members of the International Union were arrested by the Militia and were, by a military court, convicted of rioting. The smelter was finally reopened about July 16, 1935, and resumed production.

The membership of the Tri-State Union included executives and supervisory employees of the petitioners and of other operators in the District. The Tri-State Union, immediately after its organization, procured necessary financial help from the operators, including petitioners, through an arrangement for credit at a bank in Miami, Oklahoma. F. W. Evans brought about this arrangement. The Tri-State Union withdrew from the bank in June, 1935, $15,000, and withdrew $2,500 on July 8, 1935. During the period when this money was being withdrawn and used, the Tri-State Union was engaged in furnishing help to persons out of

work because of the strike and in furnishing protection to its members and to the mines, mills and smelters which had been reopened. On June 4, 1935, Evans, president of the Tri-State Union, entered into a written agreement with it which provided that he would, "so far as practicable and to the greatest extent possible, employ only members of" the Tri-State Union, and would "recognize and meet with your [the Tri-State Union's] representative or committee to the exclusion of all other organizations; and will endeavor to adjust matters which they may bring before us." On June 8, 1935, petitioner Mining Company entered into a similar agreement with the Tri-State Union.

In August, 1935, petitioner Lead Company—through Leonard Vaughn, its manager at the Joplin plant, and later through G. W. Potter, vice-president of the Mining Company and in charge of labor relations for both petitioners—urged the chemists in the Research Department of the Lead Company to join the Tri-State Union on the ground that their failure to join would be resented by the other men in the plant and might cause trouble. Kelsey Norman, attorney for the Tri-State Union, was permitted by petitioner Lead Company, on its time and premises, to address the chemists of the Research Department. He stated to them, in effect, that the Tri-State Union was recognized as the exclusive union in the mines and smelters; that the Lead Company wanted them to join. Sheppard, who was acting as Director of the Research Department and who had been instructed by Potter to have the men under him join the Tri-State Union, then advised each of the men under him that membership in the Union was compulsory and that he and the rest must join. The employees of the Research Department, including Sheppard, signed applications and became members of the Union. The Tri-State Union was allowed to enter the plant of the Lead Company at Joplin, Missouri, to obtain applications for membership, issue membership cards, and collect dues.

The Tri-State Union published a weekly paper which was first called "The Metal, Mine and Smelter Worker", and later "The Blue Card Record". The policy of the paper was controlled by the executive committee of the Union. John Garretson, a member of the committee, was its first editor. In the latter part of 1935, he was succeeded by Glenn A. Hickman, the secretary of the Union. The paper was not sent through the mails, but was distributed by hand. Its policy was, naturally, anti-International Union, anti-Affiliated Union, and pro-Tri-State Union. It held out, in substance, that the Tri-State Union was the only union acceptable to the operators of the District.

On April 14, 1937, two days after the Supreme Court of the United States had held that the National Labor Relations Act was constitutional and had ruled that such operators as the petitioners were subject to it, F. W. Evans, president of the Tri-State Union, and Kelsey Norman, its attorney, arranged for the affiliation of that Union with the A. F. of L. On April 18, 1937, at a meeting attended by 6,000 of the members of the Tri-State Union, a resolution was approved dissolving that Union and vesting authority in the executive committee to organize a new union to be affiliated with the A. F. of L. The executive committee was also authorized to hold, as trustees, the funds and property of the Tri-State Union, to be turned over to the new union when it was formed. On April 24, 1937, the A. F. of L. granted separate charters to Federal Labor Union No. 20,576, Picher and vicinity, Oklahoma; Federal Labor Union No. 20,577, Joplin and vicinity, Missouri; and Federal Labor Union No. 20,578, Galena and vicinity, Kansas. On May 20, 1937, a new union was organized by delegates from the three unions above mentioned. It was called "Blue Card Union of Zinc & Lead Mine, Mill and Smelter Workers". The same twelve men who were the executive committee of the Tri-State Union—which had come to be familiarly known in the District as the Blue Card Union—became the executive committee of the newly organized Blue Card Union, and that Union took over the funds and assets formerly owned by the Tri-State Union. Evans became the president of the Blue Card Union. On June 16, 1937, the A. F. of L. issued a certificate of affiliation to the Blue Card Union. The weekly paper, previously issued by the Tri-State Union, thereafter continued to be issued as before with some slight changes in policy appropriate to the affiliated status of the Blue Card Union. F. W. Evans tendered his resignation as president of the Union to William Green, president of the A. F. of L., in May, 1937, but it was not accepted until November of that year. By that time, all executives, foremen and other supervisory employees of the petitioners had withdrawn from the Blue Card Union.

■ There can be no doubt that the Board was justified in finding that the Tri-State Union and its successor, the Blue Card Union, were dominated and supported by the petitioners. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; International Association of Machinists, Tool & Die Makers Lodge No. 35, etc. v. National Labor Relations Board, 311 U.S. 72, 81, 61 S.Ct. 83, 85 L.Ed. ——; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 519, 520, 61 S.Ct. 320, 322, 323, 85 L. Ed. ——.

■ The contention of petitioners that their alleged domination and support of the Blue Card Union was not an issue under the pleadings, we regard as without substantial merit. The petitioners themselves referred to the dissolution of the Tri-State Union and the organization of the Blue Card Union in their answer. The Examiner ruled, in effect, that whether the Blue Card Union was in fact the Tri-State Union in another dress was an issue. Whether there should have been a formal amendment to the complaint, we think is immaterial. The Examiner afforded petitioners ample opportunity to meet this issue, and no substantial rights of the petitioners were invaded in the trial and determination of the question. Compare, National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 350, 351, 58 S.Ct. 904, 82 L.Ed. 1381; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 225, 59 S.Ct. 206, 83 L.Ed. 126.

■■ The Board's findings that the petitioners had encouraged membership in the Tri-State Union and the Blue Card Union, and had discouraged membership in the International Union, are supported by substantial evidence. The finding that they had, after the strike, required, as a condition of employment, membership in the Tri-State Union or in its successor, was not compelled by the evidence, but was not without substantial support in the evidence. That the Board might or should have decided to the contrary is immaterial. The fact that the evidence upon which one or more of the findings complained of are based consists, in whole or in part, of statements or acts of supervisory employees not shown to be within the scope of their authority did not, we think, preclude the Board from basing inferences upon such evidence. See and compare, International Association of Machinists, Tool and Die Makers Lodge No. 35, etc. v. National Labor Relations Board, 311 U.S. 72, 81, 61 S.Ct. 83, 85 L.Ed. ——; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 520, 61 S.Ct. 320, 323, 85 L.Ed. ——; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 792.

■■ Petitioners' contention that there is no substantial evidence to sustain the finding of the Board that they were responsible for the violence which had occurred when the members of the Tri-State Union clashed with the members of the International Union in connection with the progress of the back-to-work movement, raises a doubtful question. The Board, however, found that the Tri-State Union was dominated by the operators in the Tri-State District through Evans and their own supervisory employees. There was an evidentiary basis for that finding. Under the circumstances, we cannot say that the Board's finding as to responsibility for violence is without any support in the evidence. Compare, National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 366, 85 L.Ed. ——; National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905, 911; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 520, 61 S. Ct. 320, 323, 85 L.Ed. ——. And the Board is authorized to bar resumption of any unfair labor practice even though it has been abandoned. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126.

It is our conclusion that so much of the Board's order as requires the petitioners to cease and desist from the unfair labor practices which it was found they had engaged in, is valid.

That brings us to the consideration of that part of the Board's order which deals with reinstatement and back pay.

■■ Petitioners' contention that their employees who went out on strike May 8, 1935, and did not return to work were not entitled to be dealt with by the Board as employees because the labor dispute which caused the strike was not current at the time of the Board's hearing, is not tenable in view of National Labor Relations Board v. Mackay Radio & Telegraph Co., 304

U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, in which the Supreme Court said (page 344 of 304 U.S., page 910 of 58 S.Ct., 82 L.Ed. 1381): "True, there is no evidence that respondent had been guilty of any unfair labor practice prior to the strike, but within the intent of the act there was an existing labor dispute in connection with which the strike was called." And (page 345 of 304 U.S., page 910 of 58 S.Ct., 82 L.Ed. 1381): "The strikers remained employees under section 2(3) of the act, 29 U.S.C.A. § 152(3), which provides: 'The term "employee" shall include * * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment * * *.' Within this definition the strikers remained employees for the purpose of the act and were protected against the unfair labor practices denounced by it." See, also, National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, 145, certiorari denied, 304 U.S. 575, 58 S.Ct. 1045, 82 L.Ed. 1539; Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 136-139, 112 A.L.R. 948, certiorari denied, 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565. We have no doubt that those employees of the petitioners who went on strike on May 8 were on July 5, 1935, and thereafter employees of the petitioners for the purposes of the Act.

### Discriminatory Discharges.

We shall next consider the question whether the Board could, under the evidence, order the reinstatement of the claimant Sheppard with back wages. The petitioners contend that Sheppard was an executive, and not an employee within the meaning of the Act; that a proper evidentiary basis for the order is lacking; and that his reinstatement is unauthorized.

 We think that Sheppard was an "employee" within the meaning of the Act. The Trial Examiner was of the opinion that the evidence was insufficient to justify a finding that Sheppard was discriminatorily discharged. The Board found otherwise. The Board's determination must be accepted if sustained by substantial evidence.

Sheppard was a graduate chemist who began his work in the Research Department of the Lead Company in 1926; thereafter he became Assistant Director of Research; later acting Director of Research; and again Assistant Director of Research. He was acting Director of Research in the summer and fall of 1935 because the Director, Dr. Shaeffer, had resigned in August to accept another position. Sheppard's salary was originally $350 a month and reached a high of $591.66 in 1929 and 1930. Due to the depression, it had been reduced to $450 a month in 1935. The business of the Research Department was to investigate and develop new and improved methods for making and using lead and zinc and their products and by-products. The duty of the Director of Research was to supervise and assist the chemists working under him. These chemists had been employed by Sheppard. Sheppard, after Shaeffer resigned, took orders from Mr. J. R. MacGregor, a vice-president of the Lead Company, whose office was in Cincinnati, Ohio. Neither Sheppard nor the chemists under him participated in the back-to-work movement or in the organization of the Tri-State Union. On August 27, 1935, Sheppard was requested or directed by Mr. Vaughn, Manager of the Joplin plant of the Lead Company, to request the chemists in the Research Department to join the Tri-State Union. Sheppard posted a notice on the Bulletin Board in the Research Department that applications could be procured from him; and reported that he had done so. Sheppard and the chemists, as professional men, were opposed to joining, or being forced to join, a labor union of mine, mill and smelter workers, and Sheppard, on August 28, 1935, wrote to Mr. MacGregor, at Cincinnati, a three-page letter, asking him, in effect, whether membership in the Tri-State Union was a condition of employment in the Research Department. On the same day, in another letter, he sent to MacGregor a petition of all but one of the chemists, asking that they be not required to join the Tri-State Union. Sheppard also wired MacGregor asking him to advise Sheppard whether such membership was compulsory in the Research Department. On August 29, 1935, MacGregor telephoned Sheppard that membership in the Union was not compulsory and to hold matters in abeyance until MacGregor came to Joplin on September 2, 1935. Sheppard had several conferences in Joplin with MacGregor, who criticised him for keeping records about this particular matter. On September 6, 1935, MacGregor notified the employees of the Research Department by letter that the management had no requirement that any employee belong to any organization. Shortly after this, Kelsey Nor-

man, attorney for the Tri-State Union, requested permission of Sheppard to address the employees of the Research Department. Sheppard wrote MacGregor and asked him whether it was agreeable to the management of the Lead Company to grant Norman's request, stating that ordinarily he (Sheppard) would not entertain such a request. MacGregor telephoned Sheppard, directing him to grant the request. At about this same time, G. W. Potter, vice-president of the Mining Company, called Sheppard to his office, and advised him, in effect, that the Lead Company wished him and the employees under him to join the Tri-State Union, and that it was Sheppard's duty to bring this about without making it a matter of record. Sheppard questioned Potter's authority to give him instructions, since the Research Department was not a department of the Mining Company, but he stated to Potter that he would check up on Potter's authority. Sheppard then telephoned MacGregor and was told that Potter was in charge of all labor relations of petitioners in the District and to follow his instructions. This was confirmed by a letter of September 23, 1935. On September 25, 1935, Sheppard wrote MacGregor that he had granted permission to Norman to speak and that he would carry out the instructions received from Potter, although they "will include instructions which I feel are not in the interests of good working of a research department". Kelsey Norman made his address to the employees of the Research Department, urging them to join the Tri-State Union, and thereafter, as heretofore stated, Sheppard told them that he and they must join. Thereupon they all made out applications and became members of the Tri-State Union. Sheppard wrote Potter that he had carried out his instructions. In October, 1935, E. W. McMullen, a consulting chemical engineer, of Cincinnati, Ohio, was employed by the Lead Company to make a survey and investigation of the Research Department. McMullen was informed by the president of the Lead Company, its vice-president MacGregor, and its secretary-treasurer, that they desired to move the Research Department to Cincinnati and to improve its efficiency. McMullen then went to Joplin and spent two or three weeks investigating the operation of the Research Laboratory there. On November 13, 1935, he submitted to MacGregor a report in which he recommended the removal of the Research Department to Cincinnati. He criticised the efficiency of the Department

and expressed the opinion that its constructive work could be doubled. At the hearing before the Examiner, McMullen testified that he found the relations between Sheppard and the employees under him to be bad, and that the employees were critical of Sheppard. McMullen testified that, after making his report, he was offered by the Lead Company the position of Research Director, and that he made it a condition of his acceptance that Sheppard, whom he considered inefficient, dictatorial and uncooperative, should be dismissed. The Board found that before McMullen went to Joplin the Lead Company had determined to employ him and to discharge Sheppard, and that in discharging Sheppard it discriminated in regard to his hire and tenure of employment, and thus interfered with the rights of its employee guaranteed in § 7 of the Act, 29 U.S.C.A. § 157.

A majority of the Court are of the view that the Board's finding as to the discriminatory discharge of Sheppard is supported by substantial evidence. Such evidence, they feel, is found in the inferences arising from the facts that the Lead Company had employed McMullen to investigate Sheppard's department within a period of two weeks after part of the difficulty regarding his joining the Tri-State Union had occurred; that the Company had expressed dissatisfaction with Sheppard's attitude regarding the forcing of the members of his department to join the Tri-State Union, and had indicated that his reluctance constituted an obstruction to the Tri-State Union's program in the plant; that the Company appeared to have been especially irritated by Sheppard's attempt to keep a correspondence record of all that occurred with respect to labor matters in his department; and that McMullen's testimony fairly showed that it was contemplated at the time he first went to Joplin, and before he ever had prepared or submitted any report on Sheppard's department, that he was to succeed Sheppard. McMullen testified: "Q. Didn't you know * * * during the time that you were having these preliminary discussions with the gentlemen in Cincinnati, and after you come down here, that there was a very good possibility of you taking charge down here? A. There was a possibility, but it was not at all settled. * * * The surroundings of the position, the work that was required of the position, were all unknown to me. I had to find out what they were before I could accept it." These circumstances, together with the in-

disputable fact that the petitioners were guilty of a continuing course of unfair and discriminatory labor practices toward those employees who refused to conform to petitioners' Tri-State unionization plan and membership requirements satisfy the majority that the Board's finding with respect to Sheppard's discharge did not rest upon speculation or conjecture but upon substantial evidence.

The writer of this opinion disagrees with the majority view as to the sufficiency of the evidence to sustain the finding of the Board that Sheppard's discharge was discriminatory, because he regards the evidence as equally consistent with two conflicting hypotheses, which are (1) that Sheppard was discharged for conduct connected with union activities, and (2) that he was discharged for the reasons testified to by McMullen, who was an unimpeached and credible witness.

The Board's finding that Timothy Rayon was discharged because of his activities on behalf of the International Union, of which he was a member is supported by substantial evidence.

### Discriminatory Refusals to Reinstate.

As has already been pointed out, the International Union on May 8, 1935, had closed the mines, mills and smelters in the District by calling a strike. This strike, concededly, was not attributable to an unfair labor practice of petitioners. The Tri-State Union, which petitioners are found to have dominated and supported, caused or contributed to the reopening of petitioners' properties. On July 5, 1935, the petitioners were operating with about 500 men. Their operations were not fully manned, and the evidence is that some men were taken on, so that by November 1, 1935, they were employing 864 men. The Board found, justifiably, that petitioners from July 5, 1935, to November 1, 1935, had jobs available. It also found that the strike was in effect on July 5, 1935; that picketing by the International Union continued throughout the year 1935; and that the strike, up to the time of the hearing before the Examiner, had not been formally terminated. The Board determined that, in the absence of the unfair labor practice of petitioners in imposing an illegal condition upon reinstatement (membership in the Tri-State Union), they would have put back to work and paid wages to a portion of the group affected by the reinstatement and back-wage provision of its order. The theory upon which the Board proceeded was that, since the petitioners on July 5, 1935, were imposing this illegal condition upon reinstatement, and since the striking employees understood that they could be reinstated only by giving up their membership in the International Union and joining the Tri-State Union, it was not necessary to establish, as the basis for a finding of discriminatory refusal to reinstate, that each of the striking employees had applied for reinstatement or was willing or able to return to work or that his failure to work for and to earn wages from petitioner after July 5, 1935, was attributable solely to petitioners' unfair labor practice with respect to reinstatement. Most of the striking employees who are affected by the Board's order did not testify that they would have been willing to return to work for petitioners on July 5, 1935, or at any time before November 1, 1935, had it not been for petitioners' unfair labor practice. The petitioners contend that the evidence does not support the Board's finding of discriminatory refusal to reinstate such employees. This because they were on strike from July 5, 1935, to November 1, 1935, for the purpose of enforcing the demand of the International Union that it be recognized as the exclusive bargaining representative of all of the employees of petitioners, a demand which petitioners could not lawfully comply with, since the International Union did not represent a majority of petitioners' employees. Petitioners also contend that there is no evidence that the International Union was willing at any time before November 1, 1935, that its members should return to work unless such recognition was accorded, and no evidence that its members would have been willing to return to work without its consent. Petitioners point to the conference which the evidence shows took place on July 16, 1935, between G. W. Potter, representing the petitioners, and officials of the International Union, including Brown, its president. It appears that at this conference, in response to an inquiry by Potter as to the demands of the International Union, Brown stated, "We * * * make the same demand and just one: that in consideration of the fact that our organization has enlisted in its membership a substantial majority of the employees in this district, we are again demanding the right to act as sole collective bargaining agents for the employees"; that Potter stated that his information was that the International Union had only a minority of the employees, and

proposed that the members of the International return to work, build up their numerical strength, and then make their demands for recognition upon petitioners; and that Brown then stated that those terms were acceptable if Potter would further agree in writing to "recognize them as their duly authorized collective bargaining agents." Petitioners contend that what was said at this conference negatives the charge that there was a discriminatory refusal to reinstate the striking members of the International Union, and shows that their employees who were members of that organization remained away, not because of any unfair labor practice of petitioners, but because of the strike. Petitioners also called attention to a statement made by Brown's successor as president of the International Union in his annual report in 1937 with reference to the strike: "The situation in the Tri-State District is a serious one and has many ramifications. In my opinion the strike was ill-advised. The strike should have been called off as soon as the Militia arrived upon the scene, getting the men back to work and reorganizing so that they could be successful at some future date." With respect to the July 16, 1935, conference, the Board found that Potter's offer to return the strikers to work was not made in good faith and was subject to the implied condition that all members of the International Union returning to work should join the Tri-State Union.

 This Court is of the opinion that if the evidence sustains the Board's finding that the striking employees would on July 5, 1935, or thereafter while jobs were available, have applied for reinstatement and would have returned to work except for the illegal condition of reinstatement imposed by petitioners, the Board had authority to make an appropriate order with respect to reinstatement and back wages. See and compare, National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780; National Labor Relations Board v. American Mfg. Co., 2 Cir., 106 F.2d 61. We are agreed that with respect to employees included in the reinstatement and back-wage provisions of the Board's order, who were shown to have indicated a willingness to return to work at any time after the strike and before November 1, 1935, the Board's order should be sustained. The members of this Court differ only as to the power of the Board to order the reinstatement, with back

pay, of the striking employees who did not testify that they ever asked for reinstatement or would have asked for reinstatement prior to November 1, 1935, had it not been for the fact that they knew of the requirement that they join the Tri-State Union.

 A majority of the Court agree with the Board's view that, under the evidence, it was not necessary for the striking employees to have made application to return to work in order to be entitled to reinstatement and to an allowance of back pay. They regard the following findings and conclusions of the Board as clearly warranted by the evidence: "Every one of the approximately 200 claimants who testified stated, and we find, that it was their understanding that a blue card was necessary for reemployment, or for retaining employment. Under these circumstances we find that the striking employees were under no obligation to make the useless gesture of applying for their jobs." A majority of the Court approve the ruling of the Board, quoted by it in its decision, that "Willingness to reinstate employees only on the conditions above described, conditions which the respondent [the employer] had no right to attach, is equivalent to absolute refusal to reinstate." The majority further agree with the Board that, in view of the illegal condition which the petitioners had imposed upon the right to reinstatement, it was not necessary to prove that each individual employee was willing and able to return to work. The majority think there had been sufficient individual applications for reemployment on the part of International Union members prior to July 16, 1935, to indicate the need and desire of the men generally for reemployment, if the illegal condition was removed. It was a proper inference, say the majority, that the conference of July 16, 1935, was not held by the petitioners in good faith or with any intention to permit the strikers to return to work without joining the Tri-State Union; and that, while some of the International Union leaders, as a front, sought to re-assert their strike demands in the conference, it was clearly obvious that the International Union had by that time been so completely outmaneuvered by the tactics of the petitioners that its original demands had become only a minor and feeble note in the succeeding events. In this situation, according to the majority of the Court, the Board was justified in holding that, except as to such particular individuals as had indicated that they were not willing to return to work

unless the International Union was recognized, the men as a group could properly be regarded as desirous of returning and as entitled to do so, in the absence of any express showing to the contrary. And since the men as a group, with individual exceptions who were eliminated by the Board, were thus entitled to reemployment, the questions of reinstatement and back-pay allowance, under the statute and under the ruling in Phelps Dodge Corporation v. National Labor Relations Board, 61 S.Ct. 845, 849, 85 L.Ed. ——, related, in the view of the majority of this Court, solely to the means to be employed to "effectuate the policies of this Act (chapter)." Of the form and scope of these means, the majority think the Board was the sole judge.

The writer of this opinion disagrees with the majority only with respect to the reinstatement and back-wage provisions of the Board's order in so far as those provisions cover the striking employees who were not shown to have been willing to abandon the strike and to return to work prior to November 1, 1935. The disagreement of the writer is based upon the conclusion that that portion of the Board's order is punitive, and not remedial, because of the absence of evidence to justify a finding that the loss of wages suffered by these members of the group was attributable to the unfair labor practice of petitioners, and was not attributable to the strike, for which the petitioners were not responsible. See and compare, National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 258, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 10-13, 61 S.Ct. 77, 85 L.Ed. ——.

■ Petitioners contend that the Board's method of apportioning wages, the loss of which it has attributed to the unfair labor practice of petitioners, among the members of the group covered by its order, was unauthorized. We cannot see that petitioners are prejudiced in any way by the Board's method of apportionment, and we think that the Board was within its rights in determining what distribution of back wages among the members of the group found to have been discriminated against with respect to reinstatement would best effectuate the policies of the Act.

■ The petitioners challenge the Board's authority to include in its order certain striking employees who were convicted in military courts of rioting or who were indicted for crime in other courts. We think petitioners' contentions in this regard are without substantial merit. They raised no such issue in their answer, and the evidence does not show that they had any rule or policy against the employment of such persons or that their refusal or failure to reinstate any of the striking employees was based upon his conviction or indictment. See and compare National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 341-342, 60 S.Ct. 918, 84 L.Ed. 1226.

■ The petitioners further contend that the Board was guilty of laches. The controversy before the Board was initiated without serious delay, and, while it was long drawn out, there is no substantial basis for believing that the Board's powers were in any way impaired by the lapse of time during which the proceedings were pending and undisposed of.

We think it is unnecessary to discuss further questions.

The Board has requested certain modifications of its order, largely formal in character. These requests are granted.

The decree of this Court will be that the order of the Board, with the modifications requested by it, be affirmed and enforced.