Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico and its Mayagüez chapter, Petitioner, *v.* Puerto Rico Labor Relations Board, Respondent.

Nó. O-69-257. Decided December 30, 1970.

*Vicente Ortiz Colón* for petitioner. *Gilberto Gierbolini Ortiz, Solicitor General, Celia Canales González, José E. Rodríguez Rosalí,* and *Miguel A. Rivera Arroyo* for respondent.

MR. JUSTICE RIGAU delivered the opinion of the Court:

On March 7, 1969, Israel Vega, an employee of the Water Resources Authority, in the presence of other persons, attacked Engineer Humberto Alvarez, a Superintendent of the above-mentioned Authority, with a pipe on the back and the arms. The attack was committed in Mayagüez at the place of work and during working hours.

Rafael Ledesma, General Superintendent of Operation and Administration of the Authority, conducted an investigation of the incident. The victim, the aggressor, and several witnesses testified during the course of said investigation.

On March 11, on the basis of said investigation and on its findings, Ledesma wrote a letter to the employee Israel Vega, through which he preferred charges against him, informed him of the facts which gave rise to the preferment of charges, notified him that pursuant to § 5 of Art. 41 of the Collective Bargaining Agreement he was temporarily suspended from employment and salary until the hearing of the charges, and he also informed him that "you are entitled to request from the Personnel Division a hearing to prosecute these charges, petition which should be made within the next fifteen (15) working days after the service of this notice." With his letter Ledesma also sent to Israel Vega a copy of the administrative investigation and of the medical report of the physician who examined the victim. Vega was thus fully informed and in a position to appear at the hearing and defend himself therein if that was his desire.

The Collective Bargaining Agreement in question is the one signed by the Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico (UTIER) and by the Water Resources Authority on July 31, 1968. Said agreement was the one in force at the time of the incident. Section 5 of Art. 41 of the Agreement, the basis of which Vega was temporarily suspended while the charges were heard, reads as follows:

"The only cause for the suspension from employment and salary before a hearing is held are the charges for embezzlement, theft, burglary, misappropriation of the Authority's funds, or when there are well-grounded reasons to believe that there is a real hazard of destruction to the property of the Water Resources Authority *or to the life of any of its employees.*" (Italics ours.)

On March 11, 1969, the same day the Authority notified Vega of his temporary suspension, and before the mechanism provided by the Agreement for these cases of discipline could be applied, the employees of the Authority's thermoelectric plant located at Mayagüez went on strike as a result of Vega's temporary suspension. The Union intervened and took part in the strike, backing it.

Seven days later, on the 18th of that month, the Water Resources Authority filed before the Puerto Rico Labor Relations Board a charge against the Union and its Mayagüez Chapter charging the same with a violation of § 8(2)(a) of the Labor Relations Act, 29 L.P.R.A. § 69(2)(a), and on the 21st of the same month, the Legal Division of the Board, in the latter's name, filed a Complaint against the Union where it alleged, *inter alia*, the following: (a) that the defendant Union violated and continued violating the collective bargaining agreement upon initiating, calling and/or backing a strike in the operations of the Mayagüez thermoelectric plant without exhausting the remedies provided by the collective bargaining agreement for the solution of claims and disputes, as provided by Articles 39 and 45 of the agreement; (b) that because of those facts the defendant incurred and was incurring unfair labor practices in violation of § 8(2)(a) of the Act; and (c) that as a result of those facts, it requested as part of the remedy, that defendant be ordered to pay to the complainant the damages caused as a consequence of its illegal action.

The strike of the employees ceased when the employer and the Union agreed to submit the matter of Israel Vega's temporary suspension to an arbitrator. On March 19, 1969, the parties submitted said matter to arbitration on the basis of the following submission agreement:

"To determine whether, in the light of Art. 41 of the Collective Bargaining Agreement in force, the Water Resources Authority had reasonable motives to consider employee Israel Vega as a real hazard to the destruction of the property of the Authority or to the life of its employees."

In his report, the arbitrator accepted "the occurrence of a criminal act certified by a physician" but ruled that "we do not consider the hazard evidence to be sufficient so as to include the instant case in the exception provided by § 5 of Art. 41 of the Collective Bargaining Agreement."

The arbitrator, then, decided in the negative the question raised in the submission agreement. Thereafter, the arbitrator entered other conclusions in his Report: He set aside the order of temporary suspension of employment and salary; ordered the replacement of Israel Vega in his employment; ordered the payment of all the working period during which he was suspended; and ordered the holding of a plenary hearing. The arbitrator's Report bears the date of April 2, 1969.

As we said before, the Board had issued the complaint against the Union on March 21. On April 9, 1969 the Union filed its answer to the complaint, through which it accepted that it is a labor organization, which represents the Authority's employees and that at the time of the events the already mentioned collective bargaining agreement was in force. It denied everything else. On June 4, 1969, the hearing was held and the parties submitted the case on the basis of the following stipulation of facts:

"FIRST: That on March 7, 1969, an incident occurred between the employee Israel Vega and the Supervisor Humberto Alvarez.

"SECOND: That as a result of said incident the employer issued an order suspending Israel Vega from employment and salary. The order is included and made part of this Stipulation as Exhibit No. 1.

"THIRD: That as a result of the aforementioned order the employees of the Mayagüez Thermoelectric Plant went on strike. The union had knowledge of, intervened, and took part in said strike.

"FOURTH: The strike ceased when the parties agreed to submit the case to arbitration.

"FIFTH: The Arbitrator's Award, which is final and unappealable, is included as Exhibit No. 2. The collective bargaining agreement applicable in this case is included as Exhibit No. 3, and the submission signed by the parties which was submitted to the arbitrator, is included as Exhibit No. 4."

The Trial Examiner of the Board, attorney Federico Cordero, rendered his Report on August 4, 1969, and the Board, unanimously, delivered its Decision and Order on October 17 of that year. The Board adopted and included as part of its Decision and Order the findings of fact and conclusions of law of the Trial Examiner, therefore, we must consider the statements appearing in both documents about these particulars as findings of the Board.

In synthesis, the Board decided that the Union in supporting, intervening, and taking part in the strike, violated the agreement without exhausting first the remedies provided therein for the solution of disputes. Article 39, "Procedure for the Solution of Complaints." The Board, in turn, reasoned that this violation of the agreement constituted an unfair labor practice, pursuant to the proper terms of the Labor Relations Act, § 8(2)(a); 29 L.P.R.A. § 69(2)(a).

Consequently, the Board ordered the UTIER to (a) cease and desist from violating the collective bargaining agreement signed by the Water Resources Authority; (b) to compensate the Authority for the losses, if any, caused to said employer by the unfair labor practice of the Union; (c) to notify its

order to the members of the Union; and (d) to notify to the Chairman of the Board the measures taken by the Union to comply with the order of the Board.

The UTIER appeals before this Court through a petition for statutory review, § 9(2)(b) of the Labor Relations Act, 29 L.P.R.A. § 70(2)(b), and asks this Court to set aside or modify the Decision and Order of the Board. Petitioner charges the Board with the following four errors: (1) That it disregarded the arbitration award; (2) That it did not apply the recrimination doctrine under § 8(2)(a) of the Act; (3) That it erred in concluding that the Union had violated § 8(2)(a) of the Act by supporting the strike in violation of the agreement; and (4) That it acted without jurisdiction in ordering the UTIER to compensate the employer for the damages which could have been caused as a result of the strike.

■ The first error was not committed. The matters which were under the consideration of the arbitrator and of the Board are different. To put an end to the strike, the employer and the Union agreed to submit to the arbitrator the question of whether the employer, in the light of the events which occurred, had reasonable grounds to believe that the employee Israel Vega was a hazard to its property or to the life of its employees, in accordance with § 5 of Art. 41 of the agreement. That, and nothing else was submitted to the arbitrator. See the submission agreement which we copied *verbatim* above. Another was the problem before the Board: it consisted in determining whether the Union incurred an unfair labor practice by going on strike because of a case of discipline without exhausting before, regardless of the merits of the dispute, the proceedings which the agreement provided for these cases.

The decision of the arbitrator did not decide the problem raised before the Board, nor did it bind the latter. To elaborate we shall point out that petitioner itself accepted that

"the Board has exclusive power to take cognizance of unfair labor practices committed in violation of the Puerto Rico Labor Relations Act and that no other method of adjustment or prevention shall affect that power." Petitioner also acknowledges that "in a procedure for unfair practice, the Board is not bound by an award issued by an arbitrator where the facts involved may constitute at the same time the basis for unfair labor practice in the light of the Labor Relations Act."

On this particular the Act itself, in its § 7(a), 29 L.P.R.A. § 68(a), provides the following:

"The Board shall have power in the manner hereinafter provided, to prevent any person from engaging in any of the unfair labor practices enumerated in section 69 of this title. This power shall be exclusive and shall not be affected by any other method of adjustment or prevention."

The matters submitted to both entities—the Board and the arbitrator—were different and each one reached its own conclusion.

In the second assignment, as we stated before, error is charged to the Board for failing to apply the recrimination doctrine which § 8(2)(a) of the Act, 29 L.P.R.A. § 69(2) (a), allows to be applied under certain circumstances. Said legal provision provides that:

"It shall be an unfair labor practice for a labor organization acting individually or in concert with others:

"(a) To violate the terms of a collective bargaining contract including an agreement to accept an arbitration award whether the same is or is not included in a collective bargaining contract; Provided, however, That the Board may dismiss any charge in which there is alleged a violation of this subsection if the employer that is a party to the contract is guilty either of a current breach of the contract or has not complied with an order of the Board concerning any unfair labor practice as provided by this subchapter."

■ Petitioner relies on the provided clause of the above-copied paragraph (a). But said provided clause does not operate automatically. It does not say that the Board shall or that it must dismiss any charge, etc., but it says that the Board "may" do it that way. That implies that the Board shall pass on whether or not it is fair to do it thus. That is what the Board did in this case and we do not think we should disturb its conclusion. On the contrary, we understand why the Board decided not to apply such doctrine of recrimination. Let us see, in synthesis, the situation in that respect.

The Board issued a complaint against the Union charging it with having incurred an unfair labor practice by going on strike without exhausting first the remedies provided by the agreement for the solution of disputes. In its answer to the complaint the Union denied those facts, but subsequently, at the hearing, it accepted its intervention and participation in the strike. Stipulation, third paragraph. The Union alleged that the Authority violated the agreement by suspending Israel Vega temporarily and without a hearing, and that for that reason the recrimination should have been applied. However, the Union limited the filing of its case to the above-copied Stipulation and to the filing of the documents mentioned therein. It assumed, then, the position to the effect that the Trial Examiner and the Board could decide its defense relying on that evidence.

From Annex I of Exhibit I it appears that the aggrieved party, Eng. Humberto Alvarez, described the facts as follows:

"I arrived at the Plant in the morning and I went directly to the Mechanical Shop, as I usually do. I talked with the employees about the different tasks to be performed that morning. Shortly afterwards Mr. José Donate arrived and we stood in front of the gate of the Shop, at about 4 or 5 feet from the door. We talked about the things pending for that day, and how to assign the personnel to perform the work. It must have been about 8:30 a.m. And it was while I was there that I received a hard blow on the back at waist level. I turned around and saw how

Mr. Israel Vega was attacking me and trying to hit me with the pipe. He threw a second blow at me, which hit me on the left arm, and at the same time he was shouting at me: 'You hoodlum, roughneck.' Donate jumped upon Vega. At that moment Francisco Villarrubia was going by and they grabbed Vega. I was so surprised that I asked him: 'Vega, what is the matter with you?' To all this Vega answered the same thing: 'You hoodlum, roughneck.' After they grabbed him he got in his car which he had left in front of the office's entrance door. There was another person in the car. He got into the car on the right-hand side and the other person started the car and they left."

José Donate Vázquez, another witness, testified:

"I was in front of the Mechanical Shop talking about the affairs of the plant with Mr. Alvarez.

Would you explain to us what happened while you were talking?

We were talking and thus, suddenly, Mr. Israel Vega arrived and attacked Mr. Alvarez with a pipe.

Did you see the pipe?

Yes. At the moment when he was going to attack him, as far as I can remember, he said to him, 'You're a hoodlum.' And at the same time he hit him. I held him to stop the attack. I asked him after we had grabbed him, Mr. Villarrubia was witness therein, I asked him what happened to him; he didn't say anything. During the incident his glasses fell down, he picked them up and left.

No more words were spoken?

Nothing else."

In his Report the Trial Examiner stated:

"There is no doubt that on March 11, 1969, the W.R.A. had enough elements of judgment to believe that there was grounded cause to consider the case of Mr. Israel Vega in the light of § 5 of Art. 41. From Annex 1 of Exhibit 1 it appears that during the investigation performed by the W.R.A., in which the Chairman of the defendant Union took part, several witnesses pointed out that on March 7, Israel Vega hit Eng. Humberto Alvarez with a pipe on the back and on the left arm. (Annex 1 to Exhibit 2, pages 2, 5, 9.)"

"The Authority did not suspend this employee viciously and without just cause. A battery with a bruising instrument was committed at the place of employment and during working hours. The Authority, therefore, had reasons to believe that the employee could constitute a hazard 'to the life of any of its employees'."

The Board, in the exercise of its quasi-judicial power granted by law, did not consider it proper to apply the defense of recrimination. The Board had the power to apply it or not, for we have seen that the pertinent legal provision is optional and not mandatory. In the light of the facts of the instant case we do not think that the Board abused its discretion. The second error assigned was not committed.

■ The third assignment is to the effect that the Board erred in concluding that the Union violated § 8 (2) (a) of the Act by supporting a strike in violation of the agreement. The Union maintains that the agreement does not have an express no-strike clause; that in Puerto Rico the right to strike is a constitutional right; and that in the absence of a no-strike clause in the agreement, the Board could not conclude that the strike in this case constituted a violation to the agreement and therefore an unfair labor practice pursuant to § 8 (2) (a). The first two proposals mentioned in the previous sentence are true, but the third is incorrect.

■ It is true that the agreement does not contain a no-strike clause, but it contains express provisions on the procedure which the employer and the Union should observe in cases of disputes and in cases of discipline. Articles 39 and 41 of the Agreement. The Union went on strike without exhausting those remedies it had agreed to observe. The constitutional right to strike does not protect strikes in violation of collective bargaining agreements as well as the constitutional right to property does not justify that the same be obtained through breach of contracts. The constitutional right to strike may be limited by the contracting parties in the

collective bargaining agreements as well as the constitutional right to property may be limited in many ways through the contracts. Of course, in one case and the other, the liberty to enter into contracts is limited in turn, by public order considerations.[1] A Union which calls a strike because of a dispute which is subject to the grievance procedure agreed upon in the agreement violates the collective bargaining agreement, even if the agreement does not contain an explicit no-strike clause. *Local 174, Teamsters* v. *Lucas Flour Co.,* 369 U.S. 95; 49 L.R.R.M. 2717.

The intention of the Constitutional Convention, which included the right to strike in our Bill of Rights, was not to make this right so absolute as to prohibit its limitation through the collective bargaining agreements. In its Report to the Convention, the Bill of Rights Commission stated the following on this particular:

"Certainly we have not tried to claim and least to establish the right to strike without limit or without regulation. In the first place, the constitutional right fixed herein does not include sympathetic strikes, or concerted activities of illegal nature, *or actions in violation of the agreements*. The continuous existence of organisms within the Department of Labor, such as the Minimum Wage Board, the Labor Relations Board, Mediation and Conciliation Service and Arbitration, etc., and the uninterrupted rendering of their services is perfectly constitutional.

"The right of the state to issue orders to cease and desist from certain strike activities persists when according to the evidence collated by the pertinent organisms with ample protection for the worker, it is evident that the strike activity violates the agreement or otherwise surpasses the circumstances fixed in this provision. The purpose of this provision is not to encourage strikes or disagreements in the labor-management relations. Rather, on the contrary, the purpose is to facilitate those relations within a climate of mutual respect and reciprocal acknowl-

---

[1] But the constitutional guarantee implies that neither one nor the other—property and strikes—may be prohibited by law.

edgment of their essential productive interdependence. Therefor the worker is furnished very important organizing means to raise and validate their claims. But the State does not withdraw from the labor relations field to leave the work and capital to cope as well as they can with their possible conflicts without control or without arbitration. In the democratic theory the labor-management conflict is not a desideratum. The desideratum is the harmony, the cooperation, the most abundant production as a result of social justice. Within the principles of the democratic way of life when the labor-management conflict arises, it is a social problem which prejudices everybody: laborers, employers, and the public, and it must be urgently solved by everybody: laborers, employers, and the public. The strike is an expensive and unrewarding method of deciding conflicts. A well organized and socially sound society expects to resort less and less to strikes. The commission has deemed it proper to protect the right to strike in an explicit manner as the final supreme resource in the claim of the laborer's rights." (Italics ours.) 4 *Journal of Proceedings of the Constitutional Convention of Puerto Rico* 2575 (1961 Equity ed.).

The third error assigned was not committed.

Through the fourth and last assignment of errors, petitioner maintains that the Board erred in ordering the Union to compensate the Water Resources Authority for the losses it may have sustained as a result of the strike. Petitioner maintains that the Board lacks legal power to order compensation for damages.

It is true that the Act fails to state in express words that concept of compensation for damages. However, let us see which is the situation.

The Board has the duty to effectuate or to contribute to effectuate the purposes of the Labor Relations Act. These purposes are expressed in § 1 of said Act, 29 L.P.R.A. § 62, and they comprise, among others, the following: to develop the production of the country to the maximum; to distribute this production as equitably as may be possible; to develop in practice the principle of the labor-management collective

bargaining; to achieve industrial peace, adequate salaries, and the uninterrupted production of goods and services; to establish through collective bargaining the terms and conditions of employment; to eliminate, within the bounds of possibility, labor disputes by developing collective bargaining and by establishing an adequate tribunal (the Labor Relations Board) which will carry out this public policy; and it is declared that the collective bargaining agreements are vested with public interest.

In its §§ 7, 8, and 9 the Act grants explicit powers to the Board. See 29 L.P.R.A. § 68(a); § 69(1)(f); § 69(2)(a), and § 70(1)(b). Also, the Act, in its § 11, 29 L.P.R.A. § 72, provides for some additional sanctions. To the effects of what we must decide we consider as concluding the fact that when the Act states the remedies which the Board may grant or order in the course of its functions, the statute itself states that said relation is not limitative. The Act empowers the Board to issue orders to persons, employers, and labor organizations, requiring them to cease and desist from unfair labor practices and to take such action (ordered by the Board) as shall effectuate the purposes of the Act. In so doing the statute mentions some of those remedies, such as the reinstatement of employees, back pay, etc., but at the same time it makes clear that the Board may issue the order "including, but not limited to" them. Right after, the Act adds that the Board may issue "any other order against such person, employer, party, or labor organization, that shall effectuate the purposes of this Act." Section 9 of the Act, 29 L.P.R.A. § 70(1)(b). The legislative rule or limit which the Legislature imposed upon the Board about this particular is that the remedy ordered shall be designed to effectuate the purposes of the Act. Of course, that broad discretion which the Act grants to the Board to create the remedy is not limitless; it has been said that the remedy should be proper or adequate. *N.L.R.B.* v. *Link Belt Co.*, 311 U.S. 584, 600 (1941);

*N.L.R.B.* v. *Bradford Dyeing Ass'n*, 310 U.S. 318 (1940); Goldstein, *"Effectuating Policies of the National Labor Relations Act,"* 20 B.U.L. Rev. 74 (1940).

In the case at bar the Board states that the only adequate remedy to deal with the problem of unfair strikes, is the power it claims to order, as part of the remedy, that the party which causes the damages as a result of the unfair strike compensate said damages. "As a matter of fact," it says, "experience has shown us that it is the only remedy which can effectuate the public policy" of the Act. And it adds: "Our conviction is in the sense that the insufficiency of the remedy limited to the order to cease and desist, encourages violations." As an example thereof, it tells us that during 1968–69 the UTIER called four labor stoppages in the Water Resources Authority.

In support of the foregoing we can point out that a former chairman of the Board upon writing about the remedies used by that organism to prevent unfair labor practices, has stated that the same are mild and that he doubts that they are adequate. Said writer adds that when the Board began its operations it adopted the patterns of the administrative orders of the federal Labor Relations Board without questioning its efficacy; but he believes that the Board has not resorted fully to all its powers and that a "re-examination should be made of the remedies hitherto ordered to devise other and possibly more effective ones."[2]

The Board as well as the above-cited writer accept that the action of the Board is not, nor shall be, punitive, but remedial. In the case law this is nearly the universal tenor in regard to this point, but actually the use of said terms frequently constitutes an exercise in semantics which is of little assistance in solving these problems. Generally speaking the party who is bound to pay considers the order as punitive, but

---

[2] Barela, The Puerto Rico Labor Relations Act: A State Labor Policy and its Application 160, 1965.

the beneficiary considers it to be remedial. The truth is that he who compensates for a damage he has caused is not suffering a penalty, but performing a remedial action. For example, in *Rivera* v. *Labor Relations Board*, 70 P.R.R. 5, 13 (1949), we pointed out that petitioner therein complained of the fact that the Board ordered him to pay "indemnity" to certain employees. Echoing the case law on this respect we stated therein that "Our Act is remedial, not punitive," and immediately we added: "The petitioner is therefore entitled, as he argues, to deduct from the amounts due his employees any sums they earned from other employers for whom they worked during the period they were not employed by the petitioner because of the latter's unfair labor practices." The same thing can be said about the problem raised in the case at bar: the remedy ordered by the Board could not comprise the payment of damages which were not sustained or which have been compensated otherwise.

 Actually we are not dealing with a problem of private law. It is known that the Board does not administer private law, but public law. Its functions are strictly to effectuate the public purposes of the Labor Relations Act, and its orders are devised to vindicate public, not private, interests. *Virginia Electric Co.* v. *N.L.R.B.*, 319 U.S. 533, 543 (1943); *Phelps Dodge Corp.* v. *N.L.R.B.*, 311 U.S. 177, 194 (1940). That reason—to attend to the aspect of public order of the labor-management relations—is one of the reasons for the existence of the Board.[3] It would be erroneous to characterize as punitive a remedy or order of the Board which is adequate or proper to effectuate the statutory purposes of the Board. *Virginia Electric Co.*, *supra* at 543.

In view of the situation which the Board seeks to prevent, the latter tells us:

---

[3] The expertise of the organism is other. See, 1 Davis, Administrative Law Treatise, § 1.05 (1958).

"There is no doubt that the insufficiency of the remedy encourages the violations and does not effectuate the statutory purposes. It cannot be sustained that the Board is adjudging private rights, for our order only seeks to revindicate the public policy, not the private rights of the parties.

"Even in the federal jurisdiction, where . . . it may be argued that the legislative history sets forth that the Board's remedial power was limited to order payment of economic losses, efforts are being made to adjust the remedies ordered to the specific situation of each case, in order to effectuate in that manner the public policy. In case of violations of the sections which prohibit secondary boycotts, and despite the fact that the federal act provides a cause of action in damages in the federal courts (§ 303), the National Board orders the restitution of economic losses." *Bricklayers, Local 2,* 166 N.L.R.B. No. 26, 65 L.R.R.M. 1433; McCullock, *"New Remedies Under Taft Hartley Act,"* 68 L.R.R. 60.

The administrative practice of the Labor Relations Board during the last years has been to understand that it is empowered by law to order economic restitutions, because it thinks that it is the most adequate remedy to effectuate the public policy of maintaining industrial peace and discouraging the unfair labor practice which consists in the violation of collective bargaining agreements. *UTAMA y AMA,* 2-386 (1965); *Unión de Trabajadores de la Industria del Cristal,* CA-3063, D-387 (1965); *Unión Local de la Finca Victoria,* CA-3222, D-420 (1966); *Unión de Trabajadores de Cemento Mezclado,* CA-3198, D-396 (1965); *Unidad General de Trabajadores de Puerto Rico (UGT) afiliada a Seafarers International Union,* CA-3236, D-447 (1966); *UTAMA,* CA-3230, D-407 (1965); *International Longshoremen's Association, Local 1575,* D-545 (1969).

This Court has also approved remedies which contain economic sanctions issued by the Board. Thus, for example, in *L.R.B.* v. *M.B.A.,* 91 P.R.R. 484, 501 (1964), we ordered the employer to deliver to the union the amount of certain checkoff dues of the workers for the benefit of the union, as a

remedy incidental to an unlawful practice proceeding. There we said:

"Considering all the circumstances of the present case, we hold that the Board's order on the disposition of the checkoff dues is proper as a remedy incidental to an unlawful practice proceeding. Perhaps it is the only way of revendicating the public interest involved in the dispute."

We have also upheld a decision of the Board ordering the employer to compensate an employee for the loss of his income sustained during the discharge period, *plus legal interest on said income. L.R.B.* v. *Milares Realty, Inc.*, 90 P.R.R. 821, 837 (1964). There we stated that "The Board is empowered to make such pronouncement in ordering affirmative action and it may be one of the means or remedies to enforce compliance with the public policy of the Act."

*Virginia Electric Co.* v. *N.L.R.B.*, 319 U.S. 533, 543 (1943), dealt with an order of the Board to an employer, ordering the latter to reimburse its employees certain amounts which had been deducted from their wages and paid to the union as dues. The Court admitted that the reimbursement order somewhat *resembled* compensation for private injury, but it insisted that it was not a remedy for a private wrong, but that the Board's order vindicated the public interest.

The cases of the Supreme Court of the United States subsequent to 1947 do not decide the problem because the same was decided in the federal jurisdiction through a law of Congress that same year. As part of the amendments made in 1947 to the National Labor Relations Act, it provided for suits against the unions for damages arising from violations of contracts. Section 301 of the Labor Management Relations Act, 1947 (Taft-Hartley) ; 29 U.S.C. § 185.[4] But a case which considerably illuminates the aspect which we study herein is

---

[4] *Cf. United Construction Workers* v. *Laburnum Corp.*, 347 U.S. 656 (1954) ; *Automobile Workers* v. *Russell*, 356 U.S. 634 (1958).

the case of *International Brotherhood etc.* v. *National Labor Relations Board*, 320 F.2d 757 (1963). In that case the effectiveness of an order of the Federal Board which ordered to award interest on back pay was upheld, despite the fact that for 25 years the Board had not ordered the payment of interest in cases of that nature. There, the Court of Appeals of the District of Columbia, through Judge Warren E. Burger, today Chief Justice of the United States, stated the following at pages 760–761:

"Here again the question is . . . whether the absence of express statutory provision in the Act precludes the Board from allowing interest as part of the remedial action *it fashions* . . . . The Company [petitioner] argues that the Board is without power to award interest on back pay. We reject this proposition. First, in the absence of independent evidence of congressional intent, we will not construe reenactment of the labor act in 1947 and 1959 as a manifestation of congressional intent to freeze in the statute the Board's traditional refusal to grant interest on back pay. . . . Second, the absence of express statutory authorization does not necessarily operate as a limitation of power. Third, Congress has given the Board *broad* discretion *in framing* remedies which will effectuate the policies of the Act and we cannot say that the Board was without authority to change its long-standing policy." (Italics ours.)

There is no doubt that the labor-management relations in the latter part of 1970 did not develop under the same circumstances as they did more than 30 years ago when the Wagner Act in the United States (National Labor Relations Act of 1935) and the Insular Labor Relations Act of 1938 were approved, and not even when the Labor Relations Act of 1945 in force was approved.

Previously, in the absence of strong labor unions, of labor laws protecting the workers' interests, and of proper legal aid, the workers were virtually in a state of defenselessness, before the employers. It was then possible for an employer to destroy a union or to prevent its organization. This, naturally,

empowered him to practically determine the terms of the employment contract. Today the situation is different. There is abundant labor legislation to protect the workers' interests, there are strong labor unions and these unions have reliable legal representation. Actually, today it is almost impossible for an employer to destroy a union, but it is possible for a strong union to destroy a weak employer. These two forces frequently, although not necessarily, conflicting—the workers and the employer—have been already balanced or nearly balanced. Of course, the balance between said forces is not perfect. In some situations the balance swings to one side and in others it swings to the opposite direction. But the situation of defenselessness no longer exists.

As it has been recently stated by the Supreme Court of the United States "the labor movement has grown up and must assume ordinary responsibilities." *Linn* v. *United Plant Guard Workers of America*, 383 U.S. 53, 63 (1966). More recently yet, in June of this year, the federal Supreme Court, through Mr. Justice Brennan, has stated, parallel to our thought set forth herein, the difference between our days and those of a back generation insofar as labor-management relations are concerned. *Boys Markets* v. *Clerks Union*, 398 U.S. 235, 250–251 (1970).[5]

It is about time that the justice and need of framing a legal situation, which allows the party prejudiced by an unlawful strike to receive economic compensation from the party which unjustly caused the damage, be taken into consideration in Puerto Rico. For a party to cause damages illegally

---

[5] "As labor organizations grew in strength and developed toward maturity, congressional emphasis shifted from protection of the nascent labor movement to the encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes. This shift in emphasis was accomplished, however, without extensive revision of many of the older enactments, including the anti-injunction section of the Norris-La Guardia Act. Thus it became the task of the courts to accommodate, to reconcile the older statutes with the more recent ones."

without being bound to compensate them, constitutes a violation of the most elemental jural postulates.[6] We concur with the opinion of the federal Supreme Court set forth in *Phelps Dodge Corp.*, *supra*, in the sense that a statute expressive of such a large public policy as that of the Labor Relations Act must necessarily grant broad powers to the Board and carry with it the task of administrative application.[7]

As we saw before, the powers which the Act sets forth and delegates on the Board are not expressly stated. The serious and broad responsibility which the Labor Relations Act entrusts upon the Board, and the realities of such a dynamic human activity as is that of the labor-management relations make it nearly unavoidable for us to acknowledge that the Board has the power to order a party to compensate another for damages caused to the latter because of an unlawful strike, provided the Board understands that this remedy is necessary and adequate to effectuate the purposes of the Act. We have no reasons to substitute our view by that of the organism created by the Act to effectuate the purposes of the same.

Of course, in the cases where the Board orders such compensation, if the parties do not specify the damages, the Board should receive evidence on the latter and it shall make the pertinent findings of fact and conclusions of law.

---

[6] These are the jural postulates: to live an honest life, not to cause damage to another, and to give each person what belongs to him. Tit. I, Art. 3, *Corpus Juris Civilis*, Instituta; III Pound, Jurisprudence 8 (1959); Stone, Julius, The Province and Function of Law 359–368 (1961 ed.); IV Castán, *Derecho Civil Español, Común y Foral* 836–869 (9th ed. 1961); Pound, Social Control Through Law 81–83, 112–118 (1942); Maine, Ancient Law 355 (1963 ed.). Our § 1802 of the Civil Code has its equivalent in practically all the laws of the world.

[7] One of the most authorized commentators in administrative law considers this *Phelps Dodge* case as a leading one in this field. 4 Davis, *op. cit.* at 250, § 30.10. We think likewise of the case *International Brotherhood*, *supra*. For a broader treatment of this problem see the lengthy note "A Survey of Labor Remedies" in 54 Va. L. Rev. 38 *et seq.* (1968).

We must consider now the last argument raised by petitioner. The latter alleges that the Board lacks the above-argued power because it may be inferred from subdivision 13 of § 249 of the Code of Civil Procedure (Homestead Exemptions), 32 L.P.R.A. § 1130, which reads as follows:

"13. All funds, possessions and properties of labor organizations shall likewise be exempt from attachment and execution when the attachment or execution orders are entered in actions arising from or as a result of or in connection with labor disputes, lockouts or strikes; and any attachment or execution orders entered in such actions shall be without any effect."

We do not agree. Besides the problem of the effectiveness of such an unlimited exemption, which not only protects the tools, equipment, dwelling, or a definite sum, but which includes all the funds and properties of labor organizations,[8] said provision is directed against the private claims elucidated in the courts of justice. The same is not applicable when an order of the Labor Relations Board validly issued in the exercise of its public functions is concerned. A concept consistent with the latter is the one contained in § 4 of Act No. 11, of May 22, 1965, 29 L.P.R.A. § 94, which provides the following:

"For the purpose of collecting the fines that the court may impose as penalty for contempt committed in disobeying its orders hereunder, the provisions of subsection 13 of section 1130 of Title 32, shall not apply."

For the foregoing reasons, the order of the Board issued in this case on October 17, 1969, will be affirmed, except that the case will be remanded to the Board, so as to determine, after hearing the parties, whether the Water Resources Authority sustained losses caused by the unfair labor practice

---

[8] *O'Leary* v. *Croghan*, 173 N.W. 844; *Skinner* v. *Holt*, 69 N.W. 595. We are not rendering any opinion whatsoever on this problem. We limit ourselves to mention its possible existence.

committed by the UTIER, and in the event it so determines, to specify the amount thereof.

Mr. Chief Justice Negrón Fernández and Mr. Justice Hernández Matos did not participate herein; Mr. Justice Pérez Pimentel delivered an opinion concurring and dissenting in part; and Mr. Justice Santana Becerra delivered an opinion dissenting in part.

—O—

MR. JUSTICE PÉREZ PIMENTEL, concurring and dissenting in part.

San Juan, Puerto Rico, December 30, 1970

I concur in the result reached by the majority opinion, to wit: (1) the order issued by the Board on October 17, 1969, is affirmed; (2) the case is remanded to the Board so as to determine whether the Water Resources Authority sustained losses caused by the unfair labor practice committed by the UTIER, and (3) in the event it so determines to specify the amount thereof.

I dissent, however, from the pronouncement set forth in the opinion to the effect that when the Board issues an order fixing the damages caused to an employer by the unfair practice of a labor union, subdivision 13 of § 1130, 32 L.P.R.A., is not applicable. As it is known, this subdivision was added through a 1946 amendment to the Homestead Exemption Act and it provides:

"13. All funds, possessions and properties of labor organizations shall likewise be exempt from attachment and execution when the attachment or execution orders are entered in actions arising from or as a result of or in connection with labor disputes, lockouts or strikes; and any attachment or execution orders entered in such actions shall be without any effect."

The majority opinion states that that legal provision to exempt the funds, possessions and properties of labor unions

from attachment and execution is directed against private claims elucidated in the trial courts.

In the case at bar, the damages sustained by the Authority should be considered, and they are, of a private nature; but even though they were not, the cited Exemption Act does not establish any difference as to the nature of the claim, provided that the same arises from or is connected with labor disputes, lockouts or strikes.

On the other hand, there is no basis in the Act to decide that the exemption from attachment and execution of the funds and property of a labor union applies only to judicial actions followed against the Union, but that when the Labor Relations Board is the one which, by means of an order, orders the Union to pay for the damages sustained by the employer, then the Exemption Act is inoperative, and the funds and property of the Union may be attached and executed.

In our opinion this means that if the employer files before the courts an action to claim damages arising from an illegal strike, the funds and property of the union cannot be attached or executed to secure the effectiveness of the judgment rendered against the Union, but if on the contrary the employer resorts to the Labor Relations Board for the latter to determine and order the Union to pay for the damages sustained by the employer, then the property of the Union may be attached and executed.

The Act which created the Labor Relations Board did not empower the latter to issue orders of attachment and execution. Said orders necessarily must arise from the judicial authority, either by resorting to the Supreme Court so that the latter, in the exercise of its power to enforce the orders of the Board, shall order the attachment and execution of the Union's property, if it is proper at law, or by resorting to the Court of First Instance in an action for recovery of the damages assessed by the Board. In the assumption of both

cases the courts would be the ones entering the orders of attachment and execution of the funds or property of the labor union, which are exempt by law from such orders when the origin of the claim is, as in this case, a strike. As long as the Exemption Act is not repealed or amended by the Legislature, that is, declared unconstitutional by the courts, the funds, possessions, and property of the labor organizations are exempt from attachment and orders of execution when the same are entered in actions arising from or as a result of, or in connection with labor disputes, lockouts, or strikes.

When the Legislature wanted to make an exception to the broad exemption from attachment and execution of the possessions and property of labor organizations, it did so expressly as when it approved Act No. 11 of May 22, 1965, cited in the majority opinion, and by virtue of which the exemption was rendered inapplicable to the collection of certain fines imposed by the courts as penalty for contempt.

Under the pretext of its interpretation, we are not authorized to amend the exemption statute, nor is it proper, within this proceeding, to pass and decide on its unconstitutionality.

—O—

MR. JUSTICE SANTANA BECERRA, dissenting in part.

San Juan, Puerto Rico, December 30, 1970

As a general rule, I fully agree that the Puerto Rico Labor Relations Board has the power, provided it acts within its jurisdiction, to make decisions incidental to the powers and faculties expressly granted by the Act, or which are a necessary consequence of the use of such powers and faculties, even though those decisions are not set forth in the statute which created it.

But, according to the facts and circumstances of this specific case, in the absence of laws which define what an

"unlawful" strike is; in the absence of an established judicial rule of construction, and in particular, *in the absence of an understanding in the collective bargaining agreement between the Union and the Employer of not going on strike,* I understand there were no rules of law sufficiently precise to guide the action of the Union to the effects of a sanction of a penal nature in the punishment imposed on it as a fine.

Since it is a question of a penalty for nonfulfillment of a collective bargaining agreement, which is nothing else but a contract, I do not consider, as the same obligation, to agree to submit certain matters to arbitration and to agree not to go on strike.

My opinion is that, under the circumstances set forth, the obligation to pay indemnity for damages should be eliminated from the judgment in this specific case.

Since a stage of execution has not been reached yet, I do not think it is necessary to state my opinion concerning the construction of the provisions of law in force which preclude attachment against Union funds. When that moment arrives, if it were necessary to enforce the judgment I would decide that point.